Patrick J. Reilly, Esq.
Nevada Bar No. 6103
HOLLAND & HART LLP
3800 Howard Hughes Pkwy., 10th Floor
Las Vegas, Nevada, 89169
Telephone: (702) 669-4600
Facsimile:  (702) 669-4650
preilly@hollandhart.com

John R. Posthumus, Esq.
Colorado Bar No. 20950
SHERIDAN ROSS P.C.
1560 Broadway, Suite 1200
Denver, CO  80202-5141
Telephone: (303) 863-9700
Facsimile:  (303) 863-0223
jposthumus@sheridanross.com
(Admitted *pro hac vice*)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| PATTI DONNER RUBIN, a Florida resident,<br><br>Plaintiff,<br><br>v.<br><br>THE SCOTTS COMPANY LLC, an Ohio limited liability company,<br><br>Defendant. | Case No. 2:09-cv-02419-GMN-RJJ<br>**PLAINTIFF'S OPENING BRIEF IN SUPPORT OF HER CLAIM CONSTRUCTION** |

Plaintiff, Patti Donner Rubin ("Rubin" or "Plaintiff") by and through her undersigned trial counsel, urges this Court to adopt her proposed claim construction as set forth in the Joint Claim Construction and Prehearing Statement ("Joint Statement") (Doc. No. 43).  This Court is required to construe the claims as they are written with reliance on the intrinsic evidence in the case, which includes the claim language, patent specification, and file history.  The claims of 7,587,856 ("the '856 Patent") (attached as Exhibit A) that are at issue in this case are directed toward a reground growing medium and a method for making a reground growing medium.  While only a few of the terms at issue in this

1 case need to be construed by the Court in order to assist the trier of fact, Defendant The Scotts Company
2 LLC ("Scotts" or "Defendant") has proposed in the Joint Statement narrow, overly restrictive definitions
3 for almost every claim term in dispute in an attempt to reword the claims and improperly incorporate
4 limitations from the specification into the claims of the '856 Patent. If Scotts persists in pursuing its
5 flawed construction is its Responsive Brief, Rubin will address Scott's improper construction in her
6 Reply Brief.

## I.   LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION

Determining whether a patent claim is infringed is a two-step process. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). First, the claims, which consist of the numbered paragraphs at the end of the patent, must be construed or interpreted. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). This first step in interpreting the meaning of a claim, typically referred to as "claim construction," is a question of law to be determined by the Court. *Id.* at 979. Only after the Court construes the claims does the finder of fact compare the accused device to the properly interpreted claim to determine whether it infringes the claim. *See Cybor Corp.*, 138 F.3d at 1454. Plaintiff's Opening Claim Construction Brief, in addition to Scott's Responsive Brief and Plaintiff's Reply Brief and the arguments presented at the Claim Construction Hearing hearing, concern the first step, claim construction.

The Federal Circuit's decisions provide guidance on when claim construction is necessary. Claim construction is not required for every term of every claim in a patent. *See e.g., Biotec Biologische Naturverpackungen GmbH & Co. v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) ("melting" need not be construed); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (no construction necessary for "irrigating" and "frictional heat"); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 737-38 (E.D. Tex. 2005) (terms such as "parts," "equipment," and "specifications" did not need to be construed, and stating "although every word in a claim has a meaning, not every word requires a

construction"). Rather, claim construction is only necessary "when the meaning or scope of technical terms and words of art is unclear and in dispute." *U.S. Surgical Corp.*, 103 F.3d at 1568.

The Federal Circuit's decisions also provide guidance as to what must be considered when the Court engages in claim construction. Most importantly, the claim construction must be based upon the intrinsic evidence of record, namely: (1) the language of the patent claims; (2) the patent specification; and (3) the prosecution history of the patent. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc), *cert. denied*, 546 U.S. 1170 (2006). Intrinsic evidence constitutes the "public record of the patentee's claim, a record on which the public is entitled to rely." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed. Cir. 1996).

When defining the scope of a patented invention, the words of the claims are the starting point. *Id.* at 1582. That is because the claims define the scope of the patented invention and are of "primary importance" to "ascertain precisely what it is that is patented." *Phillips,* 415 F.3d at 1312 (citations omitted). When interpreting a claim, words are given their ordinary and customary meaning to one of ordinary skill in the art at the time of the invention, unless a special definition clearly appears in the specification or prosecution history proving intrinsically that the inventor used those words differently. *Id.* at 1313; *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387 (Fed. Cir. 1992).

Further, the "claim differentiation" doctrine is a specific application of the general principle that in construing the language in one claim of a patent, due consideration must be given to the language in other claims of the patent. *See Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1368-69 (Fed. Cir. 2005). The doctrine embodies the common-sense notion that language of one claim should not be interpreted as to make another claim, such as a claim dependent on the first claim, identical in scope. *Id.*

The patent specification should also be considered, as it is the "single best guide" for defining disputed claim terms and usually is "dispositive." *Vitronics*, 90 F.3d at 1582. "For claim construction purposes, the [specification] may act as a sort of dictionary, which explains the invention and may

3

define terms used in the claims." *Markman*, 52 F.3d at 976. The Federal Circuit recognizes that: "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. However, it is impermissible to import into a claim a limitation from the specification's description of preferred embodiments that does not otherwise appear in the claim. *Comark Commc'ns v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

In addition to consulting the specification, a court should also consider the prosecution history of the patent. *Phillips*, 415 F.3d at 1317. The prosecution history contains the complete record of all proceedings before the Patent Office, including any representations made by the applicant regarding the meaning of the claims. *Id.* The prosecution history can be important in interpreting the claims because it may include "express representations . . . regarding the scope of the claims." *Vitronics,* 90 F.3d at 1582; *see also Phillips*, 415 F.3d at 1317.

Lastly, courts may consider extrinsic evidence, which consists of all evidence external to the patent and its prosecution history, such as dictionaries. *Id.* at 1317-18. However, extrinsic evidence in general has been viewed as "less reliable" than the patent. *Id.* Thus, extrinsic evidence should only be considered in the context of the intrinsic evidence. *Id.* at 1319.

## II. RUBIN'S CONSTRUCTION OF DISPUTED TERMS

Rubin alleges that Scotts infringes claims 1, 2, 3, 5, 9, 10, 12, 15, 16, 17, 18, 19, 20, and 22 of the '856 Patent. Of these asserted claims, claims 1 and 15 are "independent," which means that they stand alone, while the remaining claims are "dependent," meaning that they incorporate all of the limitations of the claims from which they depend.

As set forth in the Joint Statement, the parties have agreed to a construction on 21 claim terms and are in dispute on the following 7 claim terms:

1. Growing Medium
2. Dehydrated Growing Medium
3. Initial Ratio
4. Expanding Soil

     5.  Volume-To-Volume Ratio…A Ratio Ranging From 7:1 to About 10:1
     6.  Without Reducing Said Volume to Volume Ratio

(Joint Statement at 3-5.)

**A. Growing Medium**

Rubin asserts that the term "growing medium" should be given its plain and ordinary meaning because the term is clear as written and there is no special definition for the term in the specification or prosecution history. The Court does not need to construe the term "growing medium" because the term has no special meaning in the art of soil that needs to be laid out for a jury. *See U.S. Surgical Corp.*, 103 F.3d at 1568; *Intellicall, Inc.*, 952 F.2d at 1387; *Orion IP, LLC*, 406 F. Supp. 2d at 737-38. Further, there is nothing in the specification or prosecution history that justifies restricting the definition of "growing medium" to anything other than its plain and ordinary meaning.

Alternatively, if a construction is to be applied, Rubin asserts that "growing medium" means a "bulking agent that may include other components such as nutrients, pesticides, insecticides, fungicides, plant growth enhancers or other beneficial components known to those of skill in the art." (Joint Statement at 3 and Exhibit A.) This construction is consistent with the usage of the term "growing medium" in the specification of the '856 Patent. For example, the '856 Patent provides:

> A hydrophilic fibrous bulking agent forms the majority of the growing medium. Generally, the bulking agent ranges from about 50% to about 98% of the growing medium.

('856 Patent, Col. 2, lines 48-50.) The parties have already agreed on the construction of "bulking agent" to mean:

> Hydrophilic fibrous materials including coir (fibers/dust), peat, cotton, mineral wool, paper pulp, peat bark, birch bark, wool, hair, pine bark, fir bark, redwood bark, hardwood bark, polystyrene foam, sawdust, rock, wool, perlite, vermiculite, scoria, composted organic materials, shale rock, calcined clay pellets, and volcanic pumice.

(Joint Statement at 2.) Thus, a growing medium comprises a bulking agent and there is no dispute between the parties as to what constitutes a bulking agent.

Further, as the term "growing" implies, the "medium" or "bulking agent" is used to facilitate the growth of, for example, grass seeds, as set forth in dependent claims 9 and 19. Growth is facilitated by the bulking agent and may be facilitated by other components, including for example, the components set forth in dependent claims 10 and 22, which state that the growing medium may comprise "a fertilizer, nutrients, a pesticide, an insecticide, a fungicide, a plant growth enhancer or a combination thereof," all components that facilitate growth. ('856 Patent, Claims 10 and 22.) Based on the doctrine of claim differentiation, the common-sense notion is that language of one claim should not be interpreted as to make another claim dependent on the first claim identical in scope. It is for this reason that Rubin asserts that the "bulking agent" *may* include other components such as nutrients, pesticides, insecticides, fungicides, plant growth enhancers or other beneficial components known to those of skill in the art, but is not necessarily required to have these other components.

**B.     Dehydrated Growing Medium**

Rubin asserts that the term "dehydrated growing medium" should be given its plain and ordinary meaning because the term is clear as written and there is no special definition for the term in the specification or prosecution history. The Court does not need to construe the term "dehydrated growing medium" because the term has no special meaning in the art of soil that needs to be laid out for a jury. *See U.S. Surgical Corp.*, 103 F.3d at 1568; *Intellicall, Inc.*, 952 F.2d at 1387; *Orion IP, LLC*, 406 F. Supp. 2d at 737-38. Further, there is nothing in the specification or prosecution history that justifies restricting the definition of "dehydrated growing medium" to anything other than its plain and ordinary meaning.

Alternatively, Rubin asserts that "dehydrated growing medium" means "a bulking agent having about 25% or less moisture content." (Joint Statement at 4 and Exhibit A.) This construction is consistent with the usage of the term "dehydrated growing medium" in the specification of the '856 Patent.

6

First, the meaning of "growing medium" is addressed above and not repeated here other than to state that a growing medium is a bulking agent and based on the parties' agreement on the meaning of bulking agent, coir is a bulking agent. (Joint Statement at 2.) With that context, the '856 Patent provides:

> The coir and/or other bulking agents are first dehydrated to about 25% moisture content in an air circulating oven set to approximately 95.degree. C. (step 100). Preferably, the bulking agent is dehydrated to 15% or less humidity, and more preferably to about 11% or less humidity.

('856 Patent, Col. 4, lines 53-57) and

> As shown in FIG. 9, the present exemplary embodiment begins by first dehydrating the coir and/or other bulking agents to about 25% moisture content in an air circulating oven set to approximately 95.degree. C. (step 1000). Preferably, the bulking agent is dehydrated to 15% or less humidity, and more preferably to about 11% or less humidity."

('856 Patent, Col. 9, lines 12-18.) Thus, if the Court does construe the term "dehydrated growing medium" because this term may have a special meaning in the art of compressed soil that needs to be laid out for a jury, the specification of the '856 Patent specifically provides a range starting at 25% moisture content. (*Id.*) Thus, thus based on the specification, Rubin asserts that "dehydrated growing medium" means "a bulking agent having about 25% or less moisture content."

### C. Initial Ratio

Rubin asserts that the term "initial ratio" should be given its plain and ordinary meaning because the term is clear as written and there is no special definition for the term in the specification or prosecution history. The Court does not need to construe the term "initial ratio" because the term has no special meaning in the art of soil that needs to be laid out for a jury. *See U.S. Surgical Corp.*, 103 F.3d at 1568; *Intellicall, Inc.*, 952 F.2d at 1387; *Orion IP, LLC*, 406 F. Supp. 2d at 737-38. Further, there is nothing in the specification or prosecution history that justifies restricting the definition of "initial ratio" to anything other than its plain and ordinary meaning.

7

Alternatively, Rubin asserts that "initial ratio" means "the volume-to-volume ratio at any time prior to compression." (Joint Statement at 4 and Exhibit A.) In context, the term "initial ratio" is used on both independent claims 1 and 15:

> 1. A reground growing medium, comprising:
>
> a bulking agent, wherein a particle size of said reground growing medium is less than 0.4 inches in mean diameter; and
>
> wherein said growing medium is compressed at a volume-to-volume ratio from an *initial ratio* of less than 3:1 to a ratio ranging from 7:1 to about 10:1 and
>
> then reground without reducing said volume to volume ratio to form an expanding soil mixture.
>
> 15.   A method of making a growing medium to form an expanding soil mixture, comprising:
>
> compressing a dehydrated growing medium at a volume-to-volume ratio from an *initial ratio* of less than 3:1 to a ratio ranging from 7:1 to about 10:1; and
>
> regrinding said compressed growing medium to a varying particle size of less than 0.4 inches in mean diameter.

('856 Patent, Claims 1 and 15) (emphasis added). Thus, as used in claims 1 and 15, the term "ratio" refers to "volume-to-volume" ratio (the construction of volume-to-volume ratio is addressed below). Additionally, applying the commonly understood meaning of "initial," it is clear from claim 1 and 15 that "initial ratio" relates to the ratio prior to compression.

The dispute between the parties centers on whether "initial ratio" means the ratio at "all times prior to compression" as asserted by Scotts or at "any time prior to compression" as asserted by Rubin. (Joint Construction at 4) (emphasis added). Nothing in the claim language, specification or prosecution history requires that the initial ratio be interpreted to mean the ratio at all times prior to compression. Indeed, Rubin's construction is consistent with the usage of the term "initial ratio" in the specification of the '856 Patent. For example, the '856 Patent discusses a compression ratio of 3:1 or less "pre-hydration" (which is well before compression):

> The bulking agent that is used in the growing medium is also a low-compressed bulking agent being compressed at a volume-to-volume ratio of not more than about 3:1. By using a low-compressed bulking agent the speed of rehydration and expansion of the growing medium is increased, and the expanded volume of the

8

> growing medium is usually equal to or greater than its volume before it is dehydrated and compressed. The combination of a dehydrated, non-compressed bulking agent also maintains the growing medium substantially free from all insects, diseases and weeds.

('856 Patent, Col. 3 lines 1-10). Thus, Rubin asserts that there is no justification for unduly narrowing the meaning of "initial ratio" to "all times prior to compression," and that this term should be construed to mean "the volume-to-volume ratio at <u>any</u> time prior to compression."

**D.      Expanding Soil**

Rubin asserts that the term "expanding soil" should be given its plain and ordinary meaning because the term is clear as written and there is no special definition for the term in the specification or prosecution history. The Court does not need to construe the term "expanding ratio" because the term has no special meaning in the art of soil that needs to be laid out for a jury. *See U.S. Surgical Corp.*, 103 F.3d at 1568; *Intellicall, Inc.*, 952 F.2d at 1387; *Orion IP, LLC*, 406 F. Supp. 2d at 737-38. Further, there is nothing in the specification or prosecution history that justifies restricting the definition of "expanding ratio" to anything other than its plain and ordinary meaning.

Alternatively, Rubin asserts that "expanding soil" means "soil which expands when exposed to water" (Joint Statement at 4 and Exhibit A). In context, the term "expanding soil" is used in claim 1:

> 1. A reground growing medium, comprising:
>
> a bulking agent, wherein a particle size of said reground growing medium is less than 0.4 inches in mean diameter; and
>
> wherein said growing medium is compressed at a volume-to-volume ratio from an initial ratio of less than 3:1 to a ratio ranging from 7:1 to about 10:1 and
>
> then reground without reducing said volume to volume ratio to form an *expanding soil* mixture.
>
> 15.    A method of making a growing medium to form an *expanding soil* mixture, comprising:
>
> compressing a dehydrated growing medium at a volume-to-volume ratio from an initial ratio of less than 3:1 to a ratio ranging from 7:1 to about 10:1; and
>
> regrinding said compressed growing medium to a varying particle size of less than 0.4 inches in mean diameter.

9

('856 Patent, Claims 1 and 15) (emphasis added).  Scotts does not dispute that water is used to expand the soil.  (Joint Construction at 4, "the finished product increases its volume when exposed to water…").  Rather, the parties dispute whether additional limitations should be incorporated into the construction which will be addressed by Rubin, if necessary, in her Reply Brief.  Rubin, in contrast, asserts that the common meaning of terms is appropriate and applying the common meaning of the terms, "expanding soil" means "soil which expands when exposed to water."

### E.    Volume-To-Volume Ratio…a Ratio Ranging From 7:1 to About 10:1

Rubin asserts that the terms "volume-to-volume ratio…a ratio ranging from 7:1 to about 10:1" should be given its plain and ordinary meaning because the term is clear as written and there is no special definition for the term in the specification or prosecution history.  The Court does not need to construe the term "volume-to-volume ratio" because the term has no special meaning in the art of soil that needs to be laid out for a jury.  *See U.S. Surgical Corp.*, 103 F.3d at 1568; *Intellicall, Inc.*, 952 F.2d at 1387; *Orion IP, LLC*, 406 F. Supp. 2d at 737-38.  Further, there is nothing in the specification or prosecution history that justifies restricting the definition of "initial ratio" to anything other than its plain and ordinary meaning.

Alternatively, Rubin asserts that "volume-to-volume ratio…a ratio ranging from 7:1 to about 10:1" means:

> that the compressed material expands when exposed to water to a volume 7 or more times its volume before being exposed to water, but no more than about 10 times its volume.  The volume of expansion would be determined by adding water to the compressed material, by for example, mixing by hand (such as with a tongue depressor) in a container (allowing drainage at the bottom) the compressed material while adding water, to expand the material.  The volume of the expanded material is then compared to the volume of the original compressed material before water is added.

(Joint Statement at 4 and Exhibit A).  In context, independent claims 1 and 15 provide:

1. A reground growing medium, comprising:

a bulking agent, wherein a particle size of said reground growing medium is less than 0.4 inches in mean diameter; and

10

> wherein said growing medium is compressed at a *volume-to-volume ratio* from an initial ratio of less than 3:1 to *a ratio ranging from 7:1 to about 10:1* and
>
> then reground without reducing said volume to volume ratio to form an expanding soil mixture.
>
> 15.   A method of making a growing medium to form an expanding soil mixture, comprising:
>
> compressing a dehydrated growing medium at a *volume-to-volume ratio* from an initial ratio of less than 3:1 to *a ratio ranging from 7:1 to about 10:1*; and
>
> regrinding said compressed growing medium to a varying particle size of less than 0.4 inches in mean diameter.

('856 Patent, Claims 1 and 15) (emphasis added).  As stated above, an "expanding soil" mean "soil which expands when exposed to water.  Thus, applying the plain meaning of the term "volume-to-volume ratio" means a ratio of two volumes, one after compression and one after expansion.  Rubin further proposes that the volume of expansion would be determined by adding water to the compressed material, by for example, mixing by hand (such as with a tongue depressor) in a container (allowing drainage at the bottom) the compressed material while adding water, to expand the material.  The volume of the expanded material is then compared to the volume of the original compressed material before water is added.  At the claim construction hearing, Rubin intends to give a demonstration of this measurement.

**F.      Without Reducing Said Volume to Volume Ratio**

Rubin asserts that the term "without reducing said volume-to-volume ratio" should be given its plain and ordinary meaning because the term is clear as written and there is no special definition for the term in the specification or prosecution history.  The Court does not need to construe the term "without reducing said volume-to-volume ratio" because the term has no special meaning in the art of soil that needs to be laid out for a jury.  *See U.S. Surgical Corp.*, 103 F.3d at 1568; *Intellicall, Inc.*, 952 F.2d at 1387; *Orion IP, LLC*, 406 F. Supp. 2d at 737-38.  Further, there is nothing in the specification or prosecution history that justifies restricting the definition of "without reducing said volume-to-volume ratio" to anything other than its plain and ordinary meaning.

Alternatively, Rubin asserts that "without reducing said volume-to-volume ratio" means:

> the reground material expands at least as much as the compressed (pre-reground) material when exposed to water. In other words, if the compressed (pre-reground) material expands when exposed to water to eight times its volume (according to the protocol incorporated with the definition of "volume-to-volume ratio"), the reground material would have to expand when exposed to water to eight times or more its volume before being exposed to water. The testing protocol for the reground is the same as described above for the compressed material in the definition of "volume-to-volume ratio."

(Joint Statement at 4 and Exhibit A). In context, the term "expanding soil" is used in claim 1:

> 1. A reground growing medium, comprising:
>
> a bulking agent, wherein a particle size of said reground growing medium is less than 0.4 inches in mean diameter; and
>
> wherein said growing medium is compressed at a volume-to-volume ratio from an initial ratio of less than 3:1 to a ratio ranging from 7:1 to about 10:1 and
>
> then reground *without reducing said volume to volume ratio* to form an expanding soil mixture.

('856 Patent, Claim 1) (emphasis added). The "volume-to-volume ratio" is construed above and does not change when the words "without reducing" are added. Thus, applying the common meaning of this term, Rubin asserts that the meaning of this term is that the volume-to-volume ratio is not reduced as a result of regrinding. Applying the construction for "volume-to-volume ratio," Rubin asserts that "without reducing said volume-to-volume" ratio means that "the reground material expands at least as much as the compressed (pre-reground) material when exposed to water." Stated another way, "if the compressed (pre-reground) material expands when exposed to water to eight times its volume (according to the protocol incorporated with the definition of 'volume-to-volume' ratio), the reground material would have to expand when exposed to water to eight times or more its volume before being exposed to water." As noted, the testing protocol would not change.

### III. CONCLUSION

Rubin urges the Court to adopt Rubin's proposed claim construction as set forth in the Joint Statement and in accordance with the foregoing arguments.

Dated this 6th day of May, 2011.

Respectfully submitted,

By: /s/ John R. Posthumus
John R. Posthumus
jposthumus@sheridanross.com
SHERIDAN ROSS P.C.
1560 Broadway, Suite 1200
Denver, CO 80202-5141
Telephone: 303-863-9700
Facsimile: 303-863-0223
litigation@sheridanross.com

HOLLAND & HART LLP
Patrick J. Reilly, Esq.
3800 Howard Hughes Pkwy., 10th Floor
Las Vegas, Nevada, 89169

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of May, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

| | |
|---|---|
| Chad R. Fears, Esq.<br>Gregory A. Brower, Esq.<br>Snell & Wilmer<br>3883 Howard Hughes Parkway<br>Suite 1100<br>Las Vegas, Nevada 89169-5958<br>cfears@swlaw.com<br>gbrower@swlaw.com | Lester J. Savit, Esq.<br>Jones Day<br>3161 Michelson Drive, Suite 800<br>Irvine, CA  92612<br>ljsavit@jonesday.com |
| Douglas R. Cole, Esq.<br>Jones Day<br>325 John H. McConnell Boulevard, Suite 600<br>Columbus, OH  43215<br>drcole@jonesday.com | Patrick J. Reilly, Esq.<br>Holland & Hart LLP<br>3800 Howard Hughes Pkwy., 10th Floor<br>Las Vegas, Nevada, 89169<br>preilly@hollandhart.com |

*s/ Lynn Tumey*
Lynn Tumey
Assistant to John R. Posthumus
SHERIDAN ROSS P.C.
1560 Broadway, Suite 1200
Denver, Colorado 80202-5141
Telephone:     (303) 863-9700
Facsimile:     (303) 863-0223
Email:  ltumey@sheridanross.com
            litigation@sheridanross.com