1   Gregory A. Brower (State Bar No. 5232)
    gbrower@swlaw.com
2   Chad R. Fears (State Bar No. 6970)
    cfears@swlaw.com
3   SNELL & WILMER
    3883 Howard Hughes Parkway
4   Suite 1100
    Las Vegas, Nevada 89169-5958
5   Telephone:    (702) 784-5200
    Facsimile:    (702) 784-5252
6
    Lester J. Savit (*pro hac vice*)
7   JONES DAY
    3161 Michelson Drive, Suite 800
8   Irvine, CA  92612
    Telephone:    (949) 851-3939
9   Facsimile:    (949) 553-7539
10  Douglas R. Cole (*pro hac vice*)
    JONES DAY
11  325 John H. McConnell Boulevard
    Suite 600
12  P.O. Box 165017
    Columbus, OH  43216-5017
13  Telephone:    (614) 469-3939
    Facsimile:    (614) 461-4198
14
    Attorneys for Defendant
15  THE SCOTTS COMPANY LLC,
    an Ohio limited liability company
16

17              **UNITED STATES DISTRICT COURT**

18                 **DISTRICT OF NEVADA**

19

20  PATTI DONNER RUBIN, a Florida resident,        Case No. 09-CV-02419 (RCJ) RJJ

21              Plaintiff,

22        v.                                        **THE SCOTTS COMPANY LLC'S**
                                                    **RESPONSIVE CLAIM**
23  THE SCOTTS COMPANY LLC, an Ohio                 **CONSTRUCTION BRIEF**
    limited liability company,
24
                Defendant.
25

26  / / /

27  / / /

28  / / /

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................2

II. BACKGROUND .......................................................................................................3

III. SCOTTS' PROPOSED CLAIM CONSTRUCTIONS ARE CORRECT AND SHOULD BE ADOPTED BY THE COURT ....................................................................4

    A. Seven Claim Terms Are Submitted for Judicial Construction...................................4

    B. The Meaning Of Disputed Claim Terms Is A Matter Of Law For The Court And Not The Jury To Determine ......................................................................5

    C. Scotts' Proposed Claim Constructions Are Consistent With The Doctrines Of Claim Construction And The Patent And Prosecution History .........................9

        1. "Growing Medium" ......................................................................................9

            a. "Growing Medium" Is A Means-Plus-Function Phrase That Is Limited To The Bulking Agent And Water-Retentive Polymer, And Equivalents ......................................................9

                (i) "Growing Medium" Is A Means–Plus–Function Phrase ....................................................................10

                (ii) As A Means-Plus-Function Phrase, "Growing Medium" Means Bulking Agent And Polymer, And Equivalents ............................................................11

            b. Even If "Growing Medium" Is Not Interpreted As A Means-Plus-Function Phrase, It Still Properly Includes The Water-Retentive Polymer ..............................................13

        2. "Dehydrated (Growing Medium)" ..............................................................17

        3. "Initial Ratio" ............................................................................................19

        4. "An Expanding Soil"...................................................................................22

        5. "Volume-to-Volume Ratio" ........................................................................23

        6. "A Ratio Ranging From 7:1 To About 10:1"...............................................25

        7. "Without Reducing Said Volume-to-Volume Ratio" ..................................26

IV. CONCLUSION ........................................................................................................27

i

**TABLE OF AUTHORITIES**

Page

CASES

*Biotec Biologische Naturverpackungen GmbH & Co. v. Biocorp, Inc.*,
    249 F.3d 1341 (Fed. Cir. 2001)................................................................. 8

*In Elekta Instrument S.A. v. O.U.R. Scientific International, Inc.*,
    214 F.3d 1302 (Fed. Cir. 2000)............................................... 15, 18, 21

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004)............................................... 15, 18, 21

*Intellicall, Inc. v. Phonometrics, Inc.*,
    952 F.2d 1384 (Fed. Cir. 1992)................................................................ 8

*Markman v. Westview Instruments, Inc.*,
    52 F.3d (Fed. Cir. 1995)........................................................................... 5

*Mas-Hamilton Group v. LaGard, Inc.*,
    156 F.3d 1206 (Fed. Cir. 1998)....................................................... 10, 11

*Massachusetts Institute of Technology v. Abacus Software*,
    462 F.3d 1344 (2006)....................................................................... 10, 11

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*,
    244 F.3d 1365 (Fed. Cir. 2001)................................................................ 8

*O2 Micro Int'l. Limited. v. Beyond Innovation Technology Co., Ltd.*,
    521 F.3d 1351. (2008)............................................................................ 6, 7

*Orion IP, LLC v. Staples, Inc.*,
    406 F.Supp.2d 717 (E.D. Tex. 2005)....................................................... 8

*Tandon Corp. v. US International Trade Commission*,
    831 F.2d 1017 (Fed. Cir. 1987)............................................................. 16

*The Laitram Corp. v. Rexnord, Inc.*,
    939 F.2d 1533 (Fed. Cir 1991).............................................................. 16

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997).......................................................... 7, 8

*Unique Concepts, Inc. v. Brown*,
    939 F.2d 1558 (Fed. Cir. 1991)............................................... 15, 18, 21

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)................................................................. 6

ii

**TABLE OF AUTHORITIES**
(continued)

Page

*Wang Laboratories, Inc. v. America Online, Inc.*,
  197 F.3d 1437 (Fed. Cir. 1997) ........................................................................... 17

**STATUTES**

United States Code
  Title 35, Section 112, ¶6 ............................................................................ passim

**OTHER AUTHORITIES**

Webster's Ninth New Collegiate Dictionary ........................................................ 19

## I.    INTRODUCTION

Plaintiff Patti Rubin ("Rubin") accuses Defendant The Scotts Company LLC ("Scotts") of infringing United States Patent No. 7,587,856 ("the '856 patent"). The '856 patent is attached as Exhibit A.  Scotts alleges that it is not infringing the asserted claims of the '856 patent, and that all of the claims of the patent are invalid and unenforceable due to Rubin's and her patent attorney's inequitable conduct during the patent application process.  The parties now seek judicial construction of the patent claims to obtain more certainty about their scope.

Both parties are represented by experienced patent litigators who incorporated parts of the specialized Patent Local Rules of the United States District Court for the Northern District of California into this case's Stipulated Discovery Plan and Scheduling Order ("Scheduling Order").[1]  The Scheduling Order is attached as Exhibit B.[2]  Among the Patent Local Rules adopted by the Scheduling Order were provisions requiring the parties to exchange information about the proposed claim constructions and to submit a detailed Joint Claim Construction and Prehearing Statement ("Joint Statement").[3]  *Id.*  The Joint Statement is attached as Exhibit C.

The adopted Patent Local Rules worked well in this case.  There were 28 terms initially in dispute.  The parties were able to compromise or otherwise agree to the meaning of 75% of the words and phrases – 21 terms.  Those agreed terms are identified in the Joint Statement.  Ex. C at 2-3.  As a preliminary matter, the parties request that those agreed claim constructions be adopted by the Court as part of the final claim construction order.

The meaning of only a mere seven phrases are left for the Court to resolve.[4]  Joint Statement, Ex. C, Section II, at 3-5.  The parties agree that construction of four of the claim terms

---

[1]  The full title of the Scheduling Order is Stipulated Discovery Plan and Scheduling Order Submitted in Compliance with LR-26-1(e).  It was entered on September 1, 2010.
[2]  The Scheduling Order (at 5) provides Rubin with the opportunity to reply to this brief, and allows Scotts' to file a sur-reply.
[3]  First, the parties identified the terms they proposed for construction, and conducted a meet and confer in order to narrow the number of claim terms in dispute.  Scheduling Order, Section 5(a). Second, the parties exchanged proposed claim constructions, and tried to reach agreement on the definitions of claim language.  *Id.*, Section 5(b).  Finally, the parties were given nearly a month to negotiate the wording of the Joint Statement during which time the parties had the opportunity to further resolve the claim construction disputes.  *Id.*, Section 5(c).
[4]  Plaintiff's Opening Brief in Support of Her Claim Construction ("Rubin's Opening Brief") discusses only six terms because it combines the fifth and sixth phrases listed in the Joint Statement.

are "likely to determine the infringement issues with respect to all of the claims," and two "may determine the infringement issues with respect to some of the claims." *Id.*, Section III, at 6. Hence, the constructions of the terms identified in the Joint Statement are both hotly disputed and potentially material to the outcome of the case.

Rubin contends that Scotts' proposed claim interpretations are "overly restrictive" and "improperly incorporate limitations from the specification into the claims." Rubin's Opening Brief, at 2. In reality, Scotts' proposals give reasonable meaning to the claims in light of the description of her purported "invention" in the patent. Rubin's proposals on the other hand, stretch the scope of the claims beyond any reasonable construction, and in some instances argue for a construction that effectively eliminates any meaning of the claim term. As demonstrated in detail below, Scotts' proffered interpretations make logical sense in light of other claim language and are consistent with the description of the purported invention in the patent.

## II. BACKGROUND

The '856 patent is entitled "Compressed Growing Medium" and names Rubin and Jay Gee as co-inventors. Ex. A, cover page. The '856 patent was filed on August 25, 2006 as a continuation-in-part ("CIP") application claiming the benefit of the filing date of an earlier "parent" patent application ("parent application") with the same title.[5] The parent application is attached as Exhibit D. A CIP application includes the subject matter disclosed in the parent application, and new information. As a CIP, the '856 patent claims include language found in the parent application as well as words and phrases appearing for the first time in the CIP. Compare Ex. A with Ex. E.

The subject matter of the original 2004 parent application and the 2006 CIP differed by only a single process step. *Id.* The parent application was directed to a wafer or brick of compressed material for use as a growing substrate. Ex. E. Rubin named herself as sole inventor of this wafer/brick. *Id.* The added step is "regrinding" the wafer or brick into particulate – small pieces that purportedly have the same characteristics as the wafer or brick. Ex. A. Jay Gee

---

[5] The parent application was filed on November 19, 2004, and assigned United States Serial Number 10/993,599. A copy of the publication of this application is attached as Exhibit E.

allegedly contributed the added step of "regrinding" the wafer/brick into particulate. Jay Gee was added to the CIP as a co-inventor of the CIP application with Rubin. *Id.*, cover page.

The patent contains 22 claims, including two independent claims 1 and 15, which are set forth below. Ex. A, col. 10, lns 55-63; and col. 12, lns. 3-9. The language to be construed is highlighted.

Claim 1 states:

> A reground *growing medium*, comprising: a bulking agent, wherein a particle size of said reground *growing medium* is less than 0.4 inches in mean diameter; and wherein said *growing medium* is compressed at a *volume to-volume ratio* from an *initial ratio* of less than 3:1 to a *ratio ranging from 7:1 to about 10:1* and then reground *without reducing said volume to volume ratio* to form an *expanding soil* mixture.

Claim 15 states:

> A method of making a *growing medium* to form an *expanding soil* mixture, comprising: compressing a *dehydrated growing medium* at a *volume-to-volume ratio* from an *initial ratio* of less than 3:1 to *a ratio ranging from 7:1 to about 10:1*; and regrinding said compressed *growing medium* to a varying particle size of less than 0.4 inches in mean diameter.

The preamble of claim 1 states that it is directed to a "reground growing medium."[6] In contrast, the preamble of claim 15 states that it recites "a method of making a growing medium." Because all of the dependent claims incorporate the limitations of either independent claim 1 or independent claim 15, the following discussion focuses primarily on those claims.

## III. SCOTTS' PROPOSED CLAIM CONSTRUCTIONS ARE CORRECT AND SHOULD BE ADOPTED BY THE COURT.

### A. Seven Claim Terms Are Submitted for Judicial Construction.

The parties are asking the Court to interpret seven phrases appearing in the claims. Joint Statement, Ex. C, Section II, at 3-5. The seven terms are:

1.    growing medium;

---

[6] The "preamble" of a patent claim is found at the beginning of the claim and generally sets a context for the subject matter of the claim.

1    2.    dehydrated (as it appears in the term "dehydrated growing medium");

2    3.    initial ratio;

3    4.    an expanding soil;

4    5.    volume-to-volume ratio;

5    6.    a ratio ranging from 7:1 to about 10:1; and,

6    7.    without reducing said volume-to-volume ratio.

7    Rubin's Opening Brief (at 4) correctly states that there are seven terms at issue. However, the list

8    following that statement enumerates only six, and Rubin includes only six sections in the

9    argument portion of Rubin's Opening Brief. See Sections II (A) through (F), at 4-12. The

10   explanation is that Rubin has combined the fifth and sixth phrases, "volume-to-volume ratio" and

11   "a ratio ranging from 7:1 to about 10:1," into a single claim phrase. In order to be consistent with

12   the chart showing the parties' opposing proposals on pages 3-5 of the Joint Statement, Scotts will

13   separately consider each of the seven terms in Section C below.

14

**B.    The Meaning Of Disputed Claim Terms Is A Matter Of Law For The Court And Not The Jury To Determine.**

15

16   Rubin repeats the exact same paragraph as an initial argument for each of the disputed

17   terms. Rubin's Opening Brief, at 5, 6, 7, 9, 10 and 11. The gist of the argument is that the Court

18   can bypass the claim construction process by merely finding that each term at issue "should be

19   given its plain and ordinary meaning." This argument is nothing more than Rubin's attempt to

20   submit ambiguous claim language to be argued to the jury at trial. However, to do so would be

21   highly improper because the meaning of claim language is a matter of law for the judge and not

22   the jury to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d, 967, 977-78 (Fed. Cir.

23   1995). "The reason that the courts construe claims as a matter of law and should not give such

24   task to the jury as a factual matter is straightforward: It has long been and continues to be a

25   fundamental principle of American law that 'the construction of a written evidence is exclusively

26   with the court." *Id.*, at 978.

27   It is well-settled that, in interpreting an asserted claim, the court should look first to the

28   intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in

1  evidence, the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582

2  (Fed. Cir. 1996), citing *Markman v. Westview Instruments, Inc.*, 52 F.3d, 967, 979 (Fed. Cir.

3  1995). Such intrinsic evidence is the most significant source of the legally operative meaning of

4  disputed claim language. *Vitronics* at 1582. In most situations, analysis of the intrinsic evidence

5  alone will resolve any ambiguity in a disputed claim term. *Id.*, at 1583. In such circumstances, it

6  is improper to rely on extrinsic evidence, such as inventor testimony. *Id.* Moreover, "a patentee

7  may not proffer an interpretation for the purposes of litigation that would alter the indisputable

8  public record consisting of those claims, the specification and the prosecution history...." *Id.*

9  The inventor's subjective intent as to claim scope, when unexpressed in the patent documents, has

10  no effect on claim construction. *Id.*, at 1584.

11          The controlling Federal Circuit case on a judge's obligation to construe claim language

12  that appears to have an ordinary meaning, is *O2 Micro Int'l. Limited. v. Beyond Innovation*

13  *Technology Co., Ltd.*, 521 F.3d 1351, 1360-63. (2008). In that case the defendant contended that

14  a proper construction of the term "only if" did not allow any exceptions, while the plaintiff O2

15  Micro argued that "only if" was a common term and did not require claim construction.

16  According to O2 Micro, the trial court did not need to "parse the meaning of every word in the

17  asserted claims." *Id.* The district court agreed with O2 Micro and ruled that "only if" had a well-

18  understood definition, capable of application by both the jury and the court in considering the

19  evidence submitted in support of an infringement or invalidity case. *Id.*, at 1361.

20          On appeal, the Federal Circuit disagreed:

21  The parties presented a dispute to the district court regarding the
    scope of the asserted claims - What do the patents mean when they
22  say that the feedback signal controls power "only if said feedback
    signal is above a predetermined threshold"? O2 Micro contends
23  that this "only if" limitation only applies during "steady state
    operation," while Defendants-Appellants contend that the "only if"
24  limitation applies at all times without exception. This dispute over
    the scope of the asserted claims is a question of law. In deciding
25  that "'only if' needs no construction because the term has a "'well-
    understood definition," the district court failed to resolve the
26  parties' dispute because the parties disputed not the *meaning* of the
    words themselves, but the *scope* that should be encompassed by
27  this claim language.

28

1    *Id.*, emphasis in original.

2        The Federal Circuit concluded that because the lower court "failed to adjudicate the

3  parties' dispute about the meaning of 'only if,' the parties presented their arguments to the jury."

4  *Id.*, at 1362. "By failing to construe the term, the district court left the jury free to consider these

5  arguments." *Id.* Hence, this legal claim construction issue was "improperly submitted to the

6  jury." *Id.* The judgment was vacated and the case was remanded for the district judge to construe

7  the disputed term "only if." *Id.*, at 1362-63.

8        Here, the submitted terms are disputed. The parties worked diligently to find agreement

9  with respect to 28 claim terms originally identified as disputed, and did so with respect to 21 -

10  only seven claim terms remain for the Court to construe. The parties could not agree upon the

11  meanings of these phrases after multiple exchanges of positions and meet and confers. See

12  Scheduling Order, Ex. B, at 4-5, and Section I above. These are the terms that are most hotly

13  disputed and most in need of the Court's intervention to resolve.

14        In addition, the parties agreed that six of the terms are material to the infringement issue.

15  The Scheduling Order governs the subjects to be covered in the Joint Statement. *Id.*, at 5; and

16  attached Patent Local Rule 4-3, at PAT 11. Pursuant to that rule, the parties identified four terms

17  as "likely to determine the infringement issues with respect to all the claims" and two terms that

18  "may determine the infringement issues with respect to some of the claims." Joint Statement,

19  Ex. C, Section III, at 6. Hence, the parties agree that six of the seven terms are material to the

20  determination of infringement, even without considering other issues in the case such as validity.

21        Moreover, the meaning of all seven of the terms, including "expanding soil," are disputed

22  with respect to the "scope [that] is appropriate in the context of the patents-in-suit." *O2 Micro*,

23  521 F.3d at 1361. Determining the scope of the terms in the context of a patent is a legal

24  determination within the province of the Court, and not the jury. *Id.*, at 1362. Leaving it to the

25  jury to decide the meaning of any of these phrases would constitute reversible error of law. *Id.*

26        Rubin cites several cases for the proposition that claim construction is not required for

27  every term of every claim in a patent. Rubin Initial Brief, at 2. However, those cases

28  demonstrate how risky it is for a district court to leave the meaning of a disputed claim term

1   without a claim construction. In *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1570 (Fed.

2   Cir. 1997), the jury was instructed that the language of the claims was to have its "plain

3   meaning." Plaintiff-appellant argued that the district court erred by refusing to instruct the jury

4   with respect to the plaintiff's proposed claim constructions. *Id.* This argument was not

5   successful only because U.S. Surgical "could not explain [to the court of appeals] how any

6   reasonable claim construction that it requested would have deprived the verdict of obviousness

7   [patent invalidity] of its support." *Id.*

8       In *Biotec Biologische Naturverpackungen GmbH & Co. v. Biocorp, Inc.*, 249 F.3d 1341,

9   1349 (Fed. Cir. 2001) the district court's failure to construe the term "melting" was argued as a

10  basis for reversal. The issue was decided against the appellant, but only because it was unable to

11  demonstrate that the term required construction by the lower court. *Id.* Had a disputed claim

12  term been material to the infringement or validity determinations, the failure to construe the term

13  would have been error. Similarly, in *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d

14  1365, 1380 (Fed. Cir. 2001), the lower court's refusal to construe claim terms was argued to be

15  reversible error. The decision likely would have gone toward reversal had the appellant been able

16  to demonstrate that a reasonable construction would have tipped the verdict in the other

17  direction.[7]

18      Here, only those claim terms that are hotly contested by the parties need to be addressed

19  by the Court. To the extent that the ordinary meanings applied, the parties were able to reach

20  agreement. Further, the parties agreed that all but one of the terms bears on the infringement

21  determination, which may lead to a summary judgment. For the Court to refuse to construe these

22  [7] Rubin also cites *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384 (Fed. Cir. 1992), and

23  *Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717 (E.D. Tex. 2005), to encourage the Court not
    to construe the submitted terms. In *Intellicall*, the appellate court ruled that there was no genuine

24  issue of fact presented by a dispute regarding a claim interpretation in the context of a summary
    judgment motion because claim construction is a matter of law for the court to decide. The grant

25  of summary judgment was affirmed. This case supports Scotts' position that disputed claim
    constructions present legal issues and should not be deferred to the jury. In *Orion*, the trial court

26  entertained arguments with respect to the meanings of many claim terms appearing in two
    business method patents for "generating a proposal for selling products" and for "selling parts for

27  particular equipment specified by a customer." *Id.*, at Appendix A. The court decided the
    meaning of some terms, but decided that others, such as the word "customer," could be left to

28  their ordinary meaning. The court did not, as suggested by Rubin, merely refuse to construe
    claim terms because they have ordinary English language meanings.

1    claim terms would risk improperly submitting a legal issue to the jury.

2    **C.    Scotts' Proposed Claim Constructions Are Consistent With The Doctrines Of**
       **Claim Construction And The Patent And Prosecution History.**
3

4        Scotts' proposed claim constructions give life and meaning to the claims and are

5    consistent with the doctrines of claim interpretation and the intrinsic evidence.  Each disputed

6    claim term is now addressed individually.

7                        **1.    "Growing Medium"**

8        Rubin's Opening Brief fails to identify the real point of dispute regarding "growing

9    medium."  In fact, the dispute revolves around whether Rubin's "growing medium" includes both

10   the bulking agent *and the water-retentive polymer*.  Rubin contends that the "growing medium"

11   of her purported invention does not have to include anything more than the bulking agent.  Scotts

12   contends that "growing medium" should be construed as means-plus-function language and, as a

13   result, necessarily includes the water-retentive polymer.  However, even if "growing medium" is

14   not interpreted as a means-plus-function phrase, it still must be interpreted to include both the

15   bulking agent and the water-retentive polymer.

16                   **a.    "Growing Medium" Is A Means-Plus-Function Phrase That Is**
                        **Limited To The Bulking Agent And Water-Retentive Polymer,**
17                      **And Equivalents.**

18       Many claim construction doctrines arise merely out of long-standing patent attorney

19   practices and the case law that recognizes the legal effect of those practices.  However, in one

20   instance, statutory patent law provides a specific claim construction doctrine – the interpretation

21   of means-plus function language.  The statute, 35 U.S.C. § 112, ¶6 provides:

22              An element in a claim for a combination may be expressed as a
                means or step for performing a specified function without the
23              recital of structure, material, or acts in support thereof, and such
                claim shall be construed to cover the corresponding structure,
24              material or acts described in the specification and equivalents
                thereof.
25

26       First we will establish that "growing medium" is a means-plus-function phrase.  Next, we

27   will show that the interpretation that arises from that conclusion includes the water-retentive

28   polymer.

1    **(i)     "Growing Medium" Is A Means–Plus–Function Phrase.**

2    As indicated in the statute, a means-plus-function phrase is identified by the use of a

3    functional word preceded or followed by the term "means" or other similar word.  35 U.S.C. §

4    112, ¶6.   For example, "attachment means" or "means for attachment" would properly be

5    interpreted as including the specific structure or structures for attachment described in the patent

6    specification and equivalents.

7    Phrases do not have to contain the word "means" to be construed as a means-plus-function

8    term.  In *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1214 (Fed. Cir. 1998), the United

9    States Court of Appeals for the Federal Circuit, rejected the argument that functional language

10   should not be interpreted as a means-plus-function phrase because it does not use the word

11   "means."   In that case, the court found that "lever moving *element*" was a means-plus-function

12   phrase even in the absence of the word "means."

13   > If we accepted [the patentee's] argument that we should not apply
14   > section § 112, ¶6, a "moving element" could be any device that can
     > cause the lever to move.  [The patentee's] claim, however, cannot
15   > be construed so broadly to cover every conceivable way or means
     > to perform the function of moving a lever, and there is no structure
16   > recited in the limitation that would save it from application of
     > section § 112, ¶6.  See Cole ....(reaffirming that an element in a
17   > claim for a combination may be expressed as a means or step for
     > performing a specified function without the recital of structure,
18   > material or acts in support thereof, and such claim shall be
     > construed to cover the corresponding structure, material, or acts
     > described in the specification and equivalents thereof.)
19

20   *Id.*

21   Similarly, in *Massachusetts Institute of Technology v. Abacus Software*, 462 F.3d 1344,

22   1354 (2006), the Federal Circuit held that the phrase "colorant selection *mechanism*" for

23   receiving and selecting certain signals, should be construed as a means-plus-function limitation.

24   Again, the phrase was functional and did not provide sufficient structure.   The patent's

25   specification used "mechanism" synonymously with "means" and dictionaries defined

26   "mechanism" as a "means for producing an effect." *Id.*

27   Courts look to two factors to determine whether language should be construed as a means-

28   plus-function phrase.   The first question is whether the claim language at issue is drafted as a

- 10 -

function.  *Mas-Hamilton*, at 1214.  The second question is whether the language recited in the claim provides any structure.  *Id.*

Here, the claim term "growing medium" as it appears in both independent claims 1 and 15 means "medium for growing."  The function is to grow.  In addition, just like "mechanism" in *Massachusetts Institute of Technology,* the term "medium" is synonymous with "means."  See Thesaurus.com entry for "medium."  Hence, "growing medium" expresses nothing more than a function, i.e., means for growing plants.

Independent claims 1 and 15 do not recite any structure for "growing medium."  In both claims, the phrase is strikingly isolated from any structure or relationship to other elements.  Unlike typical claim language that defines elements and relationships, "growing medium" appears completely independent and without any structural context.

All of the indicia of a means-plus-function phrase are present for the term "growing medium" to be interpreted as "means for growing."  The word growing is functional, the term "medium" is synonymous with "means," and no components are recited for accomplishing the function.  Similar to Federal Circuit's view of "moving element" in *Mas-Hamilton Group*, this Court should apply the means-plus-function statutory provision to prevent "growing medium" from being improperly construed to broadly cover "every conceivable way or means to perform the function" of growing plants.  *Mas-Hamilton*, at 1214.  The proper interpretation for the phrase is pursuant to 35 U.S.C. § 112, ¶6.

(ii)    **As A Means-Plus-Function Phrase, "Growing Medium" Means Bulking Agent And Polymer, And Equivalents.**

Once a phrase has been identified as falling within the purview of the means-plus-function provision, it must be construed consistent with the statute.  It first requires the identification of the specific structures disclosed in the patent as the "growing medium."  This is easy because the '856 patent specification is chock full of references to the growing medium as including both the bulking agent and the water retentive polymer.

The first line of the Summary of the invention leaves no doubt that the growing medium has two components.  It states, "A growing medium includes a bulking agent and a water-

- 11 -

retentive polymer blended together...." Ex. A, col. 1, lns. 39-40. The second line of the Detailed Description of the preferred embodiment similarly unequivocally identifies the growing medium as including the water-retentive polymer. It states, "More specifically, a compressed growing medium is disclosed that contains a water-retentive polymer...." Col. 2, lns. 29-30.

The ways proposed in the '856 patent for putting the "invention" together specifically teach the making of a growing medium by combining the bulking agent and water-retentive polymer. For example, the patent states: "According to one exemplary embodiment, the growing medium comprises a water retentive polymer in combination with bulking material and other components as described below." Col. 2, lns. 44-47; see also, "A pre-seeded, compressed growing medium typically uses a water-retentive polymer that has a water absorbitivity from about 50 to about 600 times its weight. ...," col. 4, lns. 41-43; and, "since the growing medium (820) used in the grow bag (800) contains a water-retentive polymer, the need for drainage holes can be eliminated since the polymer retains most of the moisture." Col. 7, lns. 62-65.

In addition, the patent drawings teach that the growing medium includes the water-retentive polymer. The third box down from the top of FIG. 1 teaches the process step of "Blend Growing Medium Components (step 110)." The body of the patent describes this step 110 as blending "growing medium" components including the bulking agent and the water-retentive polymer. Col. 4, lns. 59-62.

Even in FIG. 9, added to the patent with the "regrind step" in the 2006 CIP, the "Blend Growing Medium Components (step 1010)" are described as including the water-retentive polymer. "The growing medium components, including the bulking agent, the water-retentive polymer ... are then blended together with a roller drum (step 1010)." Col. 9, lns. 20-23.

The prosecution history further supports this view. In particular, the 2004 parent application included an Abstract stating that the growing medium "included a bulking agent and water-retentive polymer blended together." Ex. D, at 22; and Ex. E, cover page. All four of the original independent claims stated that the growing medium included the bulking agent and the

polymer.[8] Ex. D, at 16, 18 and 20; and Ex. E, at 5-6.

In sum, the components disclosed for the growing medium in the intrinsic evidence including the '856 patent claims and specification included in all instances the bulking agent and the water-retentive polymer. Hence, according to a proper means-plus-function interpretation, the "growing medium" includes the bulking agent and the water-retentive polymer, and equivalents.

> **b.** **Even If "Growing Medium" Is Not Interpreted As A Means-Plus-Function Phrase, It Still Properly Includes The Water-Retentive Polymer.**

Rubin proposes a construction that arises out of the patent's description of the "growing medium." According to Rubin, the patent defines "growing medium" to always include the bulking agent, but only optionally any other component. However, the patent is clear that this is true for all the additional components *except the water-retentive polymer*.

The body of the patent specifically states that the growing medium "*includes* one or more water-retentive polymers." Col. 3, lns. 35-36 (emphasis added). This is not expressed as a mere option. In contrast, the other components added to the bulking agent are described in terminology that indicates that they are optional. For example, the patent states:

- "The growing medium *may* also include non-ionic surfactant or emulsifier ...." Col. 4, lns. 4-5 (emphasis added).

- "The compressed growing medium *may* also contain other components, such as fertilizers, nutrients, pesticides, insecticides, fungicides, plant growth enhancers, or other beneficial components known to those of skill in the art." Col. 4, lns. 47-50 (emphasis added).

- "In addition, the encapsulating process *permits the optional* inclusion of nutrients, fertilizers and fungicides selected to address local conditions." Col. 8, lns. 38-41 (emphasis added).

---

[8] Claim 1, states, "A growing medium, comprising a bulking agent; and at least one water-retentive polymer…" Claim 17 states, "A growing medium comprising: coir; and a water-retentive polymer…." Claim 22 states, "A method of making a growing medium comprising: blending a dehydrated bulking agent and a water-retentive polymer to make a growing medium…." Claim 39 states, "A method of making a growing medium, comprising: blending a bulking agent and a water-retentive polymer to make a growing medium…"

1    Hence, the language in the patent unequivocally indicates that the "growing medium" is a

2    combination of bulking agent and water-retentive polymer, and that other components can be

3    added as an option.

4         Rubin's position lacks any support in the claims, the patent specification or the

5    prosecution history.   In fact, she can do no better than to cite to a portion of the patent that

6    supports Scotts' position.   Rubin's Opening Brief (at 5) argument relies on the following two

7    sentences from the patent (col. 2, lns. 48-50):

8              A hydrophilic fibrous bulking agent forms the majority of the
               growing medium.  Generally, the bulking agent ranges from about
9              50% to about 98% of the growing medium.

10   The first sentence clearly shows that the growing medium was contemplated to be made up of

11   more than just the bulking agent.   The statement that ***the majority of*** the growing medium is the

12   bulking agent invariably leads to the conclusion that the growing medium includes other things in

13   addition to the bulking agent.   Those other things, according to the patent, include in all instances

14   the water-retentive polymer.

15        The second sentence quoted above provides a range of ***50%-98%*** for the bulking agent in

16   the growing medium.   The maximum of 98% confirms the conclusion that Rubin did not

17   contemplate under any circumstances that the growing medium would be made entirely of (i.e.,

18   100%) the bulking agent.   Because the water-retentive polymer is described as the only non-

19   optional component, it is reasonable to conclude that it comprises at least 2% of the growing

20   medium.   Hence, even the lines of the patent quoted by Rubin support the view that the growing

21   medium is a combination of bulking agent and water-retentive polymer.

22        Rubin argues that the growing medium only optionally contains ingredients in addition to

23   the bulking agent.   When considering the broadest scope of a claim term, however, this means

24   that "growing medium" has the same scope as the term "bulking agent."   This interpretation

25   violates the claim construction rule that two terms appearing in the same claim should not be

26   interpreted to mean the same thing.   Robert C. Kahrl, *Patent Claim Construction*, Section

27   4.03[E][4], 2009 Supplement at 4-72.  ("A claim should not be construed to leave words without

28   meaning or influence on the scope of a claim.")   The patentee is presumed to have intended every

word chosen for use in a claim to have a specific function in adding to the meaning of that claim. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) (phrase "operatively connected" does not require a physical connection because the word "operatively" would otherwise be redundant).

Other examples of the application of this doctrine are legion. *In Elekta Instrument S.A. v. O.U.R. Scientific International, Inc.*, 214 F.3d 1302 (Fed. Cir. 2000), the patent described a gamma unit for radiation treatments of a patient that surrounded the patient's head for administering radiation therapy. *Id.*, at 1307. The claim stated that the beam would be directed "only in a zone extending between latitudes 30-45 degrees." *Id.* The patentee argued that this language included beams that extended from zero degrees out to 30-45 degrees. However, this construction was rejected because it "renders the reference to 30 degrees superfluous." *Id.*

Similarly, in *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558 (Fed. Cir. 1991), the patent was directed to a frame made of pieces that fit together. The claim recited an assembly that included both linear border pieces and right angle border pieces. *Id.*, at 1562. The patentee argued that the accused linear frame pieces infringed because two of the mitered pieces could be fit together to form the right angle border pieces. *Id.* This proposed interpretation was rejected as rendering redundant and without meaning the claim language requiring "right angle border pieces." *Id.*

Here, independent claims 1 and 15 use both phrases "bulking agent" and "growing medium." Rubin's proposed construction would interpret "growing medium" so broadly as to eliminate any difference between the two. If Rubin's interpretation was correct, the term "growing medium" would not require any additional components or steps and would be rendered meaningless. As every different word or phrase must be given meaning for being different, such an interpretation must necessarily be rejected.

In addition, other claim language indicates that more than the bulking agent is included in the growing medium. The last line of claim 1 states that the growing medium is a "mixture." Col. 10, ln. 63. Similarly, the second line of claim 15 states that the growing medium is a "mixture." Col. 12, ln. 4. The parties have agreed that "mixture" means "two or more

components...." Joint Statement, Ex. C, at 2.  Scotts' proposed construction that construes the growing medium to include the bulking agent and the polymer is consistent with this language. Rubin's proposed interpretation that the growing medium can be nothing more than the bulking agent does not.  Hence, the claims' references to the growing medium as a "mixture" strongly supports Scotts' position.

Finally, Rubin contends that the doctrine of claim differentiation prevents "growing medium" from being interpreted to include the water-retentive polymer because "water-retentive polymer" is added in a later dependent claim.  Under the doctrine of claim differentiation, an independent claim should not be construed as containing a limitation that is specifically recited in a claim that is dependent upon it. *Tandon Corp. v. US International Trade Commission*, 831 F.2d 1017 (Fed. Cir. 1987).  According to Rubin, if claims 1 and 15 are interpreted to require the presence of a water-retentive polymer, they will have the same scope as dependent claims that expressly add the polymer to those claims. Rubin's Opening Brief, at 6.  This argument fails for a number of reasons.

The doctrine of claim differentiation is limited in a number of ways.  First, the doctrine of equivalents is not a rigid rule of claim construction, but merely a guide. *The Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir 1991), *citing Autogiro Co. of America v. United States*, 384 F.2d 391, 404 (Ct. Cl. 1967).  Also, if a claim will bear only one interpretation, similarity will have to be tolerated. *Id.*

Moreover, it is well accepted that the doctrine does not apply to means-plus-function language pursuant to Section 112, ¶6.  The judicially developed guide to claim interpretation known as "claim differentiation" cannot override the statute. *Id.*  The scope of a means-plus function claim cannot be made open-ended by the presence of another claim specifically claiming the disclosed structure which underlies the means clause. *Id.*  A patentee cannot escape the statutory mandate by merely adding a claim or claims specifically reciting such structure. *Id.*

Here, Rubin's claim differentiation argument is trying to do exactly that.  The "growing medium" phrase is properly interpreted as means-plus-function language.   As such it is interpreted with respect to the components disclosed as a means for growing in the patent.  The

1    patent discloses that the "growing medium" is the combination of the bulking agent and the

2    water-retentive polymer.  Application of Section 112, §6 therefore requires the presence of the

3    water-retentive polymer, or its equivalent, for the claims to be infringed.  Rubin cannot undo the

4    mandate of the means-plus-function statute merely by adding a dependent claim that specifically

5    recites the water-retentive polymer and arguing that the independent claim upon which it depends

6    therefore does not include the water-retentive polymer.

7           Further, a patentee cannot use the doctrine of claim differentiation to expand the scope of

8    the claim to be "broader than what is contained in the specification and claims as filed."  *Id.*, at

9    1024.  For example, in *Wang Laboratories, Inc. v. America Online, Inc.*, 197 F.3d 1437, 1445

10   (Fed. Cir. 1997) the claim used the term "frame."  The patent disclosed only a character-based

11   system for the frame, and not a bitdisplay system.  *Id.*  A dependent claim specifically recited that

12   the frame was a character-based system.  *Id.*  The patentee argued that the doctrine of claim

13   differentiation required the independent claim to be interpreted more broadly to encompass both

14   the disclosed character-based system and the non-disclosed bitdisplay system.  *Id.*  The Federal

15   Circuit ruled that in light of the disclosure of only the character-based system, the independent

16   claim's use of the term "frame" was limited to the character-based system disclosed for the frame

17   in the patent.  *Id.*

18          The '856 patent discloses only a "growing medium" that includes both the bulking agent

19   and the water-retentive polymer.  There is no disclosure of a "growing medium" made up of only

20   the bulking agent, without the water-retentive polymer.  Hence, the term "growing medium,"

21   even if not interpreted as a means-plus-function term, is still properly construed as including both

22   the bulking agent and the polymer.

23          **2.      "Dehydrated (Growing Medium)"**

24          The parties have differing views on the meaning of the word "dehydrated" in the phrase

25   "dehydrated growing medium."  The differences are two-fold.  First, Rubin contends that the

26   dehydrated component is the bulking agent, while Scotts' position is that the entire "growing

27   medium" must be dehydrated.  Second, Rubin proposes that the term merely describes an existing

28   state of hydration, while Scotts proposes that the growing medium must be exposed to a

1  dehydrating process step in order for the claim language to be met.

2  Rubin's proposed claim construction shamelessly attempts to rewrite the claim language

3  to expand the scope of "growing medium" to encompass "bulking agent." As discussed above, it

4  is a tenet of claim construction that two different words or phrases should be given different

5  meanings. *Innova/Pure Water, Inc.*, supra; *Elekta Instrument S.A.*, supra; *Unique Concepts*,

6  supra. The language being construed is "dehydrated growing medium" and not "dehydrated

7  bulking agent" and the Court should not allow Rubin to use claim construction to substitute

8  words in the claim.

9  It is just plain logical that if both the "growing medium" and "bulking agent" phrases were

10  known and used by the patentee, "growing medium" was chosen because it is not "bulking

11  agent." Why would the patentee use the word "dehydrated growing medium" if "dehydrated

12  bulking agent" was intended? Hence, Scotts' interpretation that the entire "growing medium" and

13  not just the "bulking agent" must be dehydrated is consistent with the claim language.

14  Moreover, if Rubin's proposed claim construction of dehydrated to mean 25% or less

15  moisture content were adopted, it would eliminate any meaning of the claim limitation.

16  Hydration of 25% is higher than the moisture content of many ambient environments. In those

17  areas, "growing medium" sitting out in the ambient air would presumably meet this limitation.

18  As such this proposed claim scope would be the same with or without the term dehydrated. Such

19  a construction would violate the tenet that every word in a claim should be given meaning and not

20  be redundant. *Id.* Thus, Scotts' view that "dehydrated" means that the growing medium has been

21  exposed to a dehydrating process step as described in the patent is the proper interpretation.

22  Further, the fact that the phrase "dehydrated growing medium" appears only in claim 15,

23  and not in claim 1 supports Scotts' position. According to the first line of Claim 1, it is directed

24  to a thing - i.e., a reground growing medium. Claim 15, on the other hand, recites a method of

25  making the reground growing medium. The appearance of "dehydrated" only in method claim 15

26  strongly suggests that the term relates to a process of making the reground growing medium and

27  not to the finished, static state of the reground growing medium. Hence, the '856 patent claim

28  language itself supports Scotts' view that "dehydrated" refers to a process step and not the static

1    state of the growing medium.

2            The patent specification also supports Scotts' position.  The use of the word "dehydrate"

3    in the patent is with respect to the method for making the reground.  The first box below "Start"

4    in FIG. 9 includes only a single word, "DEHYDRATE."  FIG. 9 is described in the patent as

5    illustrating "a regrinding *method*, according to one exemplary embodiment."  Col. 2, lns. 18-19

6    (emphasis added).  The patent therefore discloses the term "dehydrate" as a method step.  Also, to

7    the extent the word "dehydrate" is found in the detailed description portion of the patent, it refers

8    to the process for making the reground growing medium.  The process is described as being

9    accomplished by the use of an air circulating oven set to 95 degrees.  Col. 9, lns. 12-16.  Scotts

10   seeks only that the word "dehydrated" be reasonably interpreted to mean that the growing

11   medium has been subject to some type of heating to reduce moisture.

12           Finally, Scotts' proposed construction is consistent with the ordinary use of the term.

13   Webster's Ninth New Collegiate Dictionary defines "dehydrate" to mean "to remove bound water

14   or hydrogen and oxygen from (a chemical compound) in the proportion in which they form

15   water."  It also defines "dehydrate" to mean, "to remove water from (as foods)."  Similarly,

16   thefreedictionary.com defines it to mean, "to remove water from, make anhydrous."  Hence, the

17   claim language, the specification and the readily accepted dictionary definition all support Scotts'

18   proposed interpretation of " dehydrated growing medium" to mean "the growing medium after is

19   has been heated to reduce moisture content to 25% or lower."

20           **3.      "Initial Ratio"**

21           Rubin correctly identified the parties' differing views of the meaning of "initial ratio" in

22   the phrase "initial ratio of less than 3:1."  Rubin contends that the claim limitation is met if the

23   volume-to-volume ratio is less than 3:1 *at any time* prior to the high compression step (that

24   further reduces the volume to the 7:1 to about 10:1 range).  Scotts contends that the limitation is

25   met only if the ratio is less than 3:1 *at all times* prior to the high compression step.  The claims,

26   the patent specification, the prosecution history and simple logic all support Scotts' proposed

27   interpretation.

28           Claims 1 and 15 recite two ratios; (1) an "initial ratio," and (2) a later "ratio ranging from

7:1 to about 10:1." In both claims, the transition from initial ratio to final ratio occurs as a result of the compression of the growing medium. Claim 1, col. 10, ln. 59; claim 15, col. 12, ln. 4. The compression causes the ratio to increase *from* a ratio of less than 3:1 *to* a ratio ranging from 7:1 to about 10:1. Claim 1, col. 10, lns. 60-61; claim 15, col. 12, lns. 5-6. The "initial" therefore refers to the fact that the growing medium has experienced little or no compression prior to the relatively high compression that puts the growing medium in the range of 7:1 to about 10:1.

It is undisputed that the "ratio" portion of the phrase "initial ratio" is the "volume-to-volume ratio." The meaning of "volume-to-volume ratio" is disputed and discussed separately in another section below. In Scotts' view, the volume-to-volume ratio is the volume (per weight) of the compressed material prior to compression as compared to the volume of the material after compression. For a ratio of 3:1, for example, the compression would reduce the volume of the compressed material to one-third of its pre-compressed volume.

The claims require that the growing medium have an "initial ratio" that is "*less than* 3:1." If the material has been compressed to a volume-to-volume ratio of 3:1 or higher - that is, to one-third or less than its original volume – it will not be covered by the claims. In other words, the material that is going to be compressed at a high pressure (to put it into the 7:1 to 10:1 range) cannot have been previously compressed to one-third or less than its original volume. Therefore, based on the claim language itself, the term "initial ratio" means that the material has not experienced anything more than low-compression prior to the high compression step.

The '856 patent specification confirms this view. It identifies the importance of not compressing the material at too high a pressure prior to the high compression step. "The bulking agent that is used ...is also a low-compressed bulking agent being compressed at not more than about 3:1." Col. 3, lns. 1-3. "By using a low-compressed bulking agent the speed of rehydration and expansion of the growing medium is increased, and the expanded volume of the growing medium is usually equal to or greater than its volume before it was dehydrated and compressed." Col. 3, lns. 1-8.

The dangers of using materials that have been previously compressed at too high a pressure are further discussed in the '856 patent in the context of reusing growing medium

1   material.

2       Traditionally, compressed growing medium that is distorted or
        broken is re-introduced into the mixture of materials to be re-
3       processed.  However, re-introduced compressed growing medium
        can only be added to virgin material so long as the ratio of re-
4       introduced  material  to  virgin  material  does  not  exceed
        approximately 10:1.  Specifically, when more than approximately
5       10% of the material used in the above mentioned methods is re-
        introduced material, compression of the mixture provides overly
6       dense hard wafers as well as causing undue stress on the press.
        Consequently, mixtures having reground content in excess of
7       approximately 10 percent have traditionally been discarded.

8

9   Col. 8, ln. 62, to col. 9, ln. 7.  Hence, the intrinsic evidence of the '856 patent specification and

10  claims supports Scotts' view that the claims require that the material not be exposed to more than

11  low compression *at all times* prior to being exposed to high compression.

12      In addition, Rubin's proposed construction violates at least one seminal tenet of claim

13  construction.  As mentioned above, every word and phrase of a claim must be given meaning.

14  *Innova/Pure Water, Inc.*, supra; *Elekta Instrument S.A.*, supra; *Unique Concepts*, supra.

15  However, Rubin's proposed construction eliminates any meaning of the phrase "initial ratio less

16  than 3:1" and would always be met because of the following syllogism:  (1) Ratios of 1:1 and 2:1

17  are less than 3:1 and, by application of simple math, would fall within the scope of the "less than

18  3:1" claim language; (2) all materials start out in a non-compressed state, and therefore have a

19  volume-to-volume ratio of 1:1; thus (3) all starting materials fall within the scope of the "less than

20  3:1" ratio limitation.

21      Rubin proposes that the "initial ratio of less than 3:1" limitation is met if the material has a

22  volume-to-volume ratio of less than 3:1 *at any time* prior to high compression.  This would

23  include the compression ratio of the starting materials, which would always be 1:1.  As

24  demonstrated above, this would mean the claim limitation would always be met.  If a proposed

25  claim interpretation is always met, the limitation is rendered redundant and meaningless.  As a

26  result, Rubin's proposed construction for "initial ratio" violates a fundamental tenet of claim

27  construction and must be rejected.

28  ///

1     **4.      "An Expanding Soil"**

2         Any child who has played in a mud puddle has noticed that soil appears to expand to, or

3     more accurately, to become dispersed and suspended within, the volume of water to which it is

4     exposed.  The "expanding soil" contemplated by the '856 patent does not encompass this type of

5     dispersion, or all soils would fall within the scope of the term.   Scotts' proposed claim

6     construction provides meaning to the term by distinguishing the soil expansion described in the

7     '856 patent from the phenomenon that occurs, for example, when water is poured into soil.

8     Rubin's proposed claim construction blurs that distinction, rendering it redundant and

9     meaningless.

10              The '856 patent specification describes that the soil expands because it absorbs

11    water.

12              The growing medium may also include a non-ionic surfactant
             or emulsifier that wets the dry hydrophilic bulking agent
13             and decreases surface tension that would otherwise prevent
             water take up.   Thus, the surfactant increases the rate at which
14             the bulking agent absorbs water. . . .

15

16    Col. 4, lns. 4-8.

17              Similarly, the patent states:

18             After     depositing     the     wafers     and     pellets,     water
             is added to the soil mixture.   When the soil mixture is wetted
19             it becomes gel-like, expands, and bonds to the soil localizing
             the seedling's growth at the point the seed capsule is deposited. . .

20

21    Col. 8, lns. 28-32.

22         The absorption characteristics of the soil, and the enhancement of its expansion when the

23    reground growing medium is exposed to water, is the result of the presence of the water-retentive

24    polymer.

25             The growing medium also includes one or more water-retentive
             polymers.   These polymers, also called superabsorbing polymers
26             (SAP's), are hydrophobic materials that can absorb fluid and retain
             it under pressure without dissolution in the fluid being absorbed.
27             The materials used are generally all synthesized by one of two
             routes.   In the first, a water soluble polymer is cross-linked so that it
28             can swell between cross-links but not dissolve.

Col. 3, lns. 35-42  Indeed, the water-retentive polymer is disclosed as absorbing up to 600 times its weight in water.  "A pre-seeded, compressed growing medium typically uses a water retentive polymer that has a water absorbtivity from about 50 to about 600 times its weight."  Col. 4, lns. 41-43.  Therefore, the soil expansion described in the patent is the result of the absorption that occurs when growing medium is exposed to water.

Scotts' proposes that "expanding soil" means that the soil increases in volume when exposed to water because it absorbs the fluid and retains it under pressure without dissolution.  This interpretation is both consistent with the description in the patent and distinguishes the expansion mechanism of the '856 patented soil from normal, everyday soil.  Rubin's proposed construction, on the other hand, would greatly expand the claim to read on any soil.  Hence, Scotts' proposed construction should be adopted and Rubin's proposal should be rejected.

### 5.    "Volume-to-Volume Ratio"

The parties appear to agree that the "ratio" in the phrase "volume-to-volume ratio" is the relationship of the growing medium volume before and after some transformative event.[9] However, the parties differ in their view of the event.  Rubin contends that the event is expansion of the growing material when it is exposed to water.  Rubin's Opening Brief, at 11.  Scotts, on the other hand, contends that the event is the compression of the material.  Both the claim language and the patent specification support Scotts' view.

The phrase "volume-to-volume ratio" appears in both claims 1 and 15 in a stanza that is about compression, not expansion.  Claim 1 states, "said growing medium is ***compressed*** at a volume-to-volume ratio from an initial ratio of less than 3:1 to a ratio ranging from 7:1 to about 10:1 (emphasis added)."  Claim 15 similarly states, "***compressing*** a dehydrated growing medium at a volume-to-volume ratio from an initial ratio of less than 3:1 to a ratio ranging from 7:1 to about 10:1 (emphasis added)."  Thus, the claims express the volume-to-volume ratio as a measure of compression, not expansion.

Further, the claims are directed to a dehydrated, reground growing medium prior to

---

[9] The dictionary definition of ratio is, "the relationship in quantity, amount, or size between two or more things.  Thefreedictionary.com, entry to "ratio.".

exposure to water.  The preamble of claim 1 refers to the claimed subject matter a "reground growing medium."  This is the dehydrated reground material, not the expanded soil that results after the reground is exposed to water.  Claim 15 is a process claim with last step being the regrinding of the compressed, dehydrated growing medium.  Again, the endpoint of this process is a dry particulate material, not a soil that has been expanded by exposure to water.  Hence, the claims in their entirety appear to be devoid of any relationship between the phrase "volume-to-volume ratio" and expansion of the finished reground growing material with water.

In addition, the claim language in all instances expresses the volume-to-volume ratio with the larger number first and the smaller number second.  For example, the initial ratio is expressed as less than 3:1, not 1:3, and the range is expressed as 7:1 to 10:1, and not 1:7 to 1:10.  The higher-to-lower ratios expressed in the claims are consistent with compression because the volume is larger before compression as compared to the volume after compression.  However, such ratios are inconsistent with expansion because the volume before expansion is less than the volume after expansion.

Further, the '856 patent specification reinforces the claims' connection between compression and volume-to-volume ratios that are expressed with higher number first.  See, for example, col. 3, lns. 2-3 ("compressed at a volume-to-volume ratio of not more than about 3:1"); and, col. 4, lns. 64-5 ("compressed at a volume-to-volume ratio ranging from about 7:1 to about 10:1).  Hence, the claim language and the patent specification provide compelling evidence that the volume-to-volume ratio refers to the volume reduction resulting from compression, not expansion due to hydration.  Scotts' proposes that the construction of volume-to-volume ratio include reference to the weight of the material before and after the compression.  Relative volume has no meaning without a weight reference to assure that the volume change has been entirely the result of compression and not the loss or gain of material.  For example, the 7:1 volume-to-volume ratio would be defined as the decrease of volume per pound of material by a factor of seven.

/ / /

/ / /

### 6.   "A Ratio Ranging From 7:1 To About 10:1"

The dispute regarding the phrase "a ratio ranging from 7:1 to about 10:1" is essentially the same as that dispute regarding the meaning of "volume-to-volume ratio" in Section 5 above. Scotts proposed that "a ratio ranging from 7:1 to about 10:1" means that the high compression step reduces the volume of the growing material to between 1/7th and 1/10th its volume before the high compression step.  The 7 of the 7:1 ratio is the volume of the growing material before compression, while the 1 is the volume of the growing material after compression.  Similarly, the 10 of the 10:1 ratio is the volume of the growing material before compression, while again the 1 is the volume of the growing material after compression.  If compression reduces the growing material volume to 1/9th its pre-compression volume, the claim limitation is met.  If compression only reduces the growing material volume to 1/6th its pre-compression volume, the claim limitation is not met.

As discussed in Section 5 above, in construing the claim, a weight reference is needed to assure that the volume of the same quantity of material is compared before and after compression. This will prevent an argument that the volume reduction is 7:1 when the amount of material subject to the post-compression volume measurement is actually less than the amount of pre-compression material.  Hence, Scotts' proposes that the Court adopt the following construction for this phrase: "The volume per weight of material (volume divided by weight) before the high compression step is seven or more times (but no more than ten times) the volume per weight of material after the high compression step."

Rubin's proposed construction again incorrectly uses expansion and not compression as the transformative event that is expressed in the ratio.  In other words, Rubin's construction would measure the amount of compression by measuring the amount the compressed growing material expands when exposed to water. As discussed in Section 5 above, the patent claims and patent specification uniformly support the view that the ratio expresses the relationship between the pre-compression volume and the post-compression volume.  Rubin's proposed construction seems to be contrary to the use of compression used in the claims and the order of the numbers in the ratios.  There is no teaching in the patent for using the amount of expansion of pressure

1   growing material as a measure of the amount of the compression that should be used to compress

2   the growing material into wafers - in fact neither the claims nor the patent specification identifies

3   the amount of expansion that is expected or desired in the finished reground material.   Scotts'

4   proposed construction, and not Rubin's, is correct.

5          7.   **"Without Reducing Said Volume-to-Volume Ratio"**

6        The parties agree that the phrase "without reducing said volume-to-volume ratio" relates

7   to the transformation that occurs during the regrinding step.   The volume of the solid wafer before

8   the regrinding step is compared to the volume of the growing medium in particulate form after the

9   regrinding step.   The patent specification describes the relationship between the pre-regrinding

10   and post-regrinding materials:

11   
12       According   to   the   present   exemplary   embodiment,
    the   initial   compression   of   the   base   material   stabilizes
    the   structure   of   the   materials.   Regrinding   the   already   stable
13       materials   simply   breaks   the   compressed   material   into   smaller
    sections of compressed material.
14   

15   Col. 9, lns. 53-57.

16        Scotts' proposed construction is consistent with its earlier stated constructions of

17   "volume-to-volume ratio" and "a ratio ranging from 7:1 to about 10:1."   Here, the "without

18   reducing ..." claim language means that the volume of the growing medium does not increase as a

19   result of the regrinding step.   If a weight reference is added for clarity, then Scotts' proposal

20   would require that the volume per weight of the growing medium would not increase as a result

21   of regrinding.

22        Rubin's proposed construction is very convoluted.   If adopted, it would require (1) the

23   determination of how much the compressed growing medium before regrinding expands when

24   exposed to water, (2) the determination of how much the reground growing medium expands

25   when exposed to water, and (3) a comparison of the two.   According to Rubin, the claim language

26   means that the growing material expands at least as much or more after the regrinding step as

27   before.   Again, as discussed in detail in Section 5 above, this appears to be contrary to the

28   "compression" language in the claims, and the order of the numbers express in the ratios in the

1    claims and the specification.  There is no indication in the patent or the prosecution history that

2    the desirable amount of compression can be or should be determined by measuring the amount of

3    expansion when hydrated.  Moreover, there is no disclosure in the patent or claims with respect to

4    the amount of expansion that is desirable or expected.  In sum, Scotts' proposed construction for

5    the "without reducing ..." language, should be adopted by the Court.

6    **IV.    CONCLUSION**

7             The parties have submitted seven claim terms to the Court to be construed.  The disputed

8    claim constructions may directly impact infringement and other issues in the case, and should be

9    resolved as part of this claim construction proceeding.  For every claim term, Rubin's proposals

10   are unreasonably broad and in some cases improperly eliminate any meaning of the term,

11   rendering it redundant.  Scotts' proposals provide clarity to the claim language and are supported

12   by the intrinsic evidence.  Scotts' proposed constructions, and the 21 agreed interpretations,

13   should be adopted as the Court's conclusions of law.

14   Dated: May 20, 2011                          Respectfully submitted,

15

16                                                By: _____

17                                                Gregory A. Brower (State Bar No. 5232)
                                                  gbrower@swlaw.com
18                                                Chad R. Fears (State Bar No. 6970)
                                                  cfears@swlaw.com
19                                                SNELL & WILMER
                                                  3883 Howard Hughes Parkway
20                                                Suite 1100
                                                  Las Vegas, Nevada 89169-5958
21                                                Telephone:     (702) 784-5200
                                                  Facsimile:     (702) 784-5252
22

23                                                Lester J. Savit (*pro hac vice*)
                                                  JONES DAY
24                                                3161 Michelson Drive, Suite 800
                                                  Irvine, CA 92612
25                                                Telephone:     (949) 851-3939
                                                  Facsimile:     (949) 553-7539

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Douglas R. Cole (*pro hac vice*)
JONES DAY
325 John H. McConnell Boulevard
Suite 600
P.O. Box 165017
Columbus, OH  43216-5017
Telephone:     (614) 469-3939
Facsimile:      (614) 461-4198

Attorneys for Defendant
THE SCOTTS COMPANY LLC, an Ohio
limited liability company

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on the 20th day of May, 2011, I electronically transmitted the

3  foregoing **THE SCOTTS COMPANY LLC'S RESPONSIVE CLAIM CONSTRUCTION**

4  **BRIEF** to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of

5  Electronic Filing to all counsel in this matter; all counsel being registered to receive Electronic

6  Filing.

7

8                                    *Maria Jimenez*
                         An employee of Snell & Wilmer
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28