**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| PATTI DONNER RUBIN, a Florida resident, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> THE SCOTTS COMPANY LLC, an Ohio limited liability company, et al. <br><br> Defendants. | Case No.: 2:09-cv-02419-GMN-RJJ <br><br> **ORDER** |

**INTRODUCTION**

Before the Court are Plaintiff Patti Donner Rubin (hereinafter "Rubin") and Defendant The Scotts Company LLC's (hereinafter "Scotts") proposed claim constructions. Rubin filed her Opening Brief on May 6, 2011 (ECF No. 47) and Scotts filed a Responsive Brief on May 20, 2011 (ECF No. 49). Rubin filed a Reply Brief on June 3, 2011 (ECF No. 51), and as agreed by the parties, Scotts filed a Sur-reply Brief on June 17, 2011 (ECF No. 54). A Tutorial Hearing was held on October 25, 2011, and a *Markman* Claim Construction Hearing was held on November 8, 2011.

This is an Order for claim construction of terms for United States Patent number 7,587,856 (hereinafter "the '856 patent"). The parties have submitted seven (7) terms and phrases for construction as well as twenty-one (21) terms the parties have agreed to as to the claim construction. (*See* Joint Statement, ECF No. 43.) The Court will adopt the claim construction for the twenty-one (21) terms submitted by the parties as reflected herein. After consideration of the briefs and material submitted by the parties, the arguments of counsel at the claim construction hearing, and the record before the Court, the Court issues this Order

construing the disputed terms.

**FACTS AND BACKGROUND**

Plaintiff Patti Rubin is the President and majority shareholder of The IPatt Group, Inc. ("Ipatt"), a Las Vegas-based company. (First Amended Compl. 2:15–18, ECF No. 34.) Ipatt manufactures, packages and sells products under the name "Wonder Soil" that are covered by the '856 patent. (*Id.*) Plaintiff is the co-inventor and sole owner of the '856 patent that discloses a "Compressed Growing Medium." (*Id.* at 1:22–23.)

Defendant The Scotts Company LLC is an Ohio limited liability corporation that makes, sells and distributes garden and lawn products throughout the United States. (*Id.* at 1:27–2:3.) Plaintiff alleges that Defendant's product, EZ SEED, which has been sold, offered for sale, promoted and advertised infringes on the '856 patent. (*Id.* at 3:3–5.) Plaintiff filed the instant suit on December 23, 2009 alleging infringement of the '856 patent.

**DISCUSSION**

**A.     Legal Standard**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed.Cir.2004)). The purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384 (1996). The meaning of claim language is a matter of law for the judge and not for the jury to decide. *Id.* at 977–79.

"The words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips*, 415 F.3d at 1312 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term

1 would have to a person of ordinary skill in the art at the time of the invention." *Phillips*, 415 F.3d
2 at 1313; *see Innova*, 381 F.3d at 1116. "The inquiry into how a person of ordinary skill in the art
3 understands a claim term provides an objective baseline from which to begin claim
4 interpretation." *Phillips*, 415 F.3d at 1313. "[T]he person of ordinary skill in the art is deemed to
5 read the claim term not only in the context of the particular claim in which the disputed term
6 appears but in the context of the entire patent, including the specification." *Id.*

7 In certain cases, "the ordinary meaning of claim language as understood by a person of
8 skill in the art may be readily apparent even to lay judges, and claim construction in such cases
9 involves little more than the application of the widely accepted meaning of commonly
10 understood words." *Id*. at 1314. In other cases, the claim term may have a particular meaning in
11 the field of art that is not immediately clear. The Court must examine those sources available to
12 the public to show what a person skilled in the art would have understood the disputed claim
13 language to mean. *Id.* Those sources include "words of the claims themselves, the remainder of
14 the specification, the prosecution history, and extrinsic evidence concerning relevant scientific
15 principles, the meaning of technical terms, and the state of the art." *Id.*

16 How the term is used in the asserted claim can be highly instructive. *Id.* Also, other
17 claims of the patent can be valuable sources of enlightenment as to the meaning of a claim term.
18 *Vitronics*, 90 F.3d at 1582. Differences among the claims can provide a useful guide in
19 understanding claim terms. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir.
20 1991). "For example, the presence of a dependent claim that adds a particular limitation gives
21 rise to a presumption that the limitation in question is not present in the independent claim."
22 *Phillips*, 415 F.3d at 1314–15.

23 The claims are not read in isolation, but are read in light of the specification, of which
24 they are a part. *Markman*, 52 F.3d at 979. The specification is the single best guide to the
25 meaning of a disputed term. *Vitronics*, 90 F.3d at 1582; *See Metabolite Labs., Inc. v. Lab. Corp.*

*of Am. Holdings*, 370 F.3d 1354, 1360 (Fed.Cir.2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention."). Therefore, the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. *Phillips*, 415 F.3d at 1316.

Courts can also look to the prosecution history as part of "intrinsic evidence" to determine how the Patent Office and the inventor understood the patent. *See Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992). However, the prosecution history lacks the clarity of the specification and more often is less useful for claim construction purposes. *See Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed.Cir.2002) (the ambiguity of the prosecution history made it less relevant to claim construction); *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1580 (Fed.Cir.1996) (the ambiguity of the prosecution history made it "unhelpful as an interpretive resource" for claim construction).

Finally, district courts can also rely on extrinsic evidence which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. "However, while extrinsic evidence 'can shed useful light on the relevant art,'[ it is] 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed.Cir.2004)) (internal citations omitted).

**B.      Claim Construction**

Before the Court's *Markman* claim construction hearing and before the parties began their briefing for claim construction, they submitted a Joint Statement to the Court outlining the agreed upon construction for twenty-one (21) terms. Accordingly, the Court adopts the parties' construction and will construe the twenty-one (21) terms as follows:

**reground growing medium:**  The growing medium after it has been compressed and ground into particulate.

**compressed growing medium:**  The growing medium after it has been compressed.

**bulking agent:**  Hydrophilic fibrous materials including coir (fibers/dust), peat, cotton, mineral wool, paper pulp, peat bark, birch bark, wool, hair, pine bark, fir bark, redwood bark, hardwood bark, polystyrene foam, sawdust, rock, wool, perlite, vermiculite, scoria, composted organic materials, shale rock, calcined clay pellets, and volcanic pumice.

**comprising:**  This is a term of art used by patent attorneys to transition between the claim's preamble and the body of the claim. It is used to denote that the claim is "open ended." That is, it means the claim includes within its scope products or methods that contain the elements recited in the claim, even if the product or method contains additional elements. For example, a claim using the transitional term "comprising" that recites only elements A and B, would include within its scope a product or process that contains elements A, B and C.

**said:**  This is a term of art used by patent attorneys to denote that the following structural feature or method step has previously been introduced into the claim – it is not a newly introduced feature or step. In the lexicon of patent law, a term preceded by "said" indicates that the term has an antecedent basis in the claim.

**wherein ... said reground growing medium (claim 1):**  The antecedent basis for "said reground growing medium" is found in the preamble. The reference to "reground growing medium" refers to the finished product.

**compressed:**  Reducing volume by application of pressure.

**reground:**  To transform the compressed wafer or brick into smaller particulate pieces.

**mixture:**  Matter consisting of two or more components that retain their own properties.

**polymer:**  A large molecule consisting of repeating structural units linked by covalent bonds.

**water-retentive polymer:**  Superabsorbent polymer that can absorb fluid and retain it under pressure without dissolution in the fluid being absorbed.

**water-soluble binder material:** A polymer used to bind a growing medium together when wet and help to maintain the structural integrity of the growing medium – the example of which is PVA.

**coir:** Coconut derived material including coir fibers and coir dust.

**further comprising seeds:** Seeds are added to the growing medium either prior to compression, seeds prior to grinding or after regrinding.

**further comprising a fertilizer, nutrients, a pesticide, an insecticide, a fungicide, a plant growth enhancer or a combination thereof:** One or more of the listed ingredients is included either prior to compression, prior to grinding or after regrinding.

**initially compressed into at least one wafer, pellet, brick or slab:** Batch processing in which an individual compressed wafer, pellet, brick or slab piece is produced before the regrinding step.

**dehydrated package:** Packaging that has been specifically treated to remove moisture and to maintain the dryness level to avoid germination.

**vacuum-packed:** Air and/or water are evacuated from the storage bag or container, thus decreasing oxygen content and humidity in and around the soil mixture.

**packaging:** Putting the material into a package of any sort such as a sack, bag or box.

**further comprising adding seeds to the reground growing medium:** Seeds are added to the growing medium prior to compression, prior to regrinding or after regrinding.

**further comprising adding seeds or a water retentive polymer to said dehydrated growing medium:** Seeds or a water-retentive polymer, or both, are added to the growing medium prior to compression, prior to regrinding or after regrinding.

The parties dispute the construction of seven terms: (1) growing medium; (2) initial ratio; (3) volume-to-volume ratio; (4) a ratio ranging from 7.1 to about 10.1; (5) dehydrated growing medium; (6) without reducing said volume-to-volume ratio; and (7) expanding soil.

Independent claims 1 and 15 provide the basis for the dispute over the seven (7) terms. The disputed terms are highlighted in bold below.

Claim 1:

> A reground **growing medium**, comprising:
> a bulking agent, wherein a particle size of said reground **growing medium** is less than 0.4 inches in mean diameter; and
> wherein said **growing medium** is compressed at a **volume-to-volume ratio** from an **initial ratio** of less than 3:1 to **a ratio ranging from 7:1 to about 10:1** and then reground **without reducing said volume-to-volume ratio** to form an **expanding soil** mixture.

Claim 15:

> A method of making a **growing medium** to form an expanding soil mixture, comprising: compressing a **dehydrated growing medium** at a **volume-to-volume ratio** from an **initial ratio** [sic] of less than 3:1 to **a ratio ranging from 7:1 to about 10:1**; and regrinding said compressed **growing medium** to a varying particle size of less than 0.4 inches in mean diameter.

### 1. Growing Medium

**Proposed Constructions[1]**

| | |
|---|---|
| **Rubin** | The common meaning of this term should apply. Alternatively, a bulking agent that may include other components such as nutrients, pesticides, insecticides, fungicides, plant growth enhancers or other beneficial components known to those of skill in the art. |
| **Scotts** | A combination of a bulking agent and a water-retentive polymer, and equivalents thereof. |

The main dispute is whether or not the growing medium must include a water-retentive polymer. Rubin argues that the plain and ordinary meaning of the term should apply and offers that the term "growing medium" appears to be a well understood term in the art. For example, Rubin provides a printout from www.simplyhydro.com that states that "anything that a plant can grow in is considered a growing medium." (*See* Rubin Reply Brief, Ex. A, ECF No. 51–1.) The printout then lists several types of growing mediums including coconut fiber, sand, gravel, water, and saw dust. (*See id.*)

Scotts asserts that the term growing medium in claim one should be construed as a means-

---

[1] The parties' proposed constructions are taken from their joint statement. (ECF No. 43.)

plus-function phrase that requires a water retentive polymer. In the alternative, Scotts argues that the specification discloses an invention that must include a water-retentive polymer as part of the growing medium.

### a. Means-plus-function

A special class of claim language is construed as means-plus-function claim terms and the analysis is governed by 35 U.S.C. § 112, ¶6, which provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Means-plus-function claiming applies only to "purely functional limitations that do not provide the structure that preforms the recited function." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1023 (Fed. Cir. 2006).

Using the term "means" is an important factor in determining whether a claim is in this format. "[T]he use of the word 'means' triggers a presumption that the inventor used this term advisedly to invoke the statutory mandates for means-plus-function clauses." *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998). Conversely, "a claim term that does not use 'means' will trigger a rebuttable presumption that [35 U.S.C.] §112, ¶ 6 does not apply." *DePuy Spine*, 469 F.3d at 1023(quoting *CCS Fitness v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002)). This burden must be met by a preponderance of the evidence. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1045 (Fed. Cir. 1992). "In deciding whether either presumption has been rebutted, the focus [is] on whether the claim as properly construed recites sufficiently detailed structure to avoid the ambit of § 112, ¶ 6." *Personalized Media Commc'ns*, 161 F.3d at 704 (citations omitted).

In *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1214 (Fed. Cir. 1998), the

United States Court of Appeals for the Federal Circuit, rejected the argument that functional language should not be interpreted as a means-plus-function phrase because it does not use the word "means." In that case, the court found that "lever moving element" was a means-plus-function phrase in the absence of the word means because there was no structure recited in the limitation that would save it from § 112, ¶6. That court noted that if they accepted the patentee's argument that §112, ¶6 should not apply then a "moving element" could be any device that can cause the lever to move and therefore the claim cannot be construed so broadly.

As another example, in *Massachusetts Institute of Technology v. Abacus Software*, 462 F.3d 1344, 1354 (2006), the Federal Circuit held that the phrase "colorant selection mechanism" for receiving and selecting certain signals, should be construed as a means-plus-function limitation. The court found that the patentee used "mechanism" and "means" as synonyms, that the phrase was functional, and the claim did not provide sufficient structure.

Scotts argues that similar to *Mass. Inst. of Tech.*, the term "medium" in this case is synonymous with "means" which means that the "growing medium" expresses a function, i.e. a means for growing plants. Scotts also asserts that the phrase "growing medium" is isolated from any structure or relationship with other elements. Rubin argues that there is a presumption against construing the term as a means-plus-function limitation because the term "means" does not appear in the claim.

The Court finds that in the instant case, Scotts has not overcome the rebuttable presumption that 35 U.S.C. §112, ¶ 6 does not apply. Scotts argues that the word growing is functional. The functional terms in *Mass. Inst. of Tech* and *Mas-Hamilton* described what the disputed term or element would do. For example, the "colorant selection mechanism" described a mechanism that could select a signal. *See Mass. Inst. of Tech.*, 462 F.3d at 1344. Similarly, in *Mas-Hamilton*, the "lever moving element" was an element that will move a lever.

In the '856 patent, the "medium" or some other structure will not be growing but will be

providing a structure for a plant to grow in. The limitation is not drafted as a function to be performed but as a definite structure or material. This construction is supported by Rubin's evidence that "anything that a plant can grow in is considered a growing medium." (*See* Rubin Reply Brief, Ex. A, ECF No. 51–1.) However, growing medium is still limited by the remaining claim language because it must be something that can be compressed and reground. Therefore, the Court does not find that this claim is governed by §112, ¶6.

### b. Water Retentive Polymer

Scotts' next argument is that the term "growing medium" should be construed to include a water retentive polymer. Scotts contends that the patent specification describes the "growing medium" to always include the water retentive polymer. For example:

- "A growing medium includes a bulking agent and a water-retentive polymer blended together . . ." (Col. 1, ll. 39–40.)

- "More specifically, a compressed growing medium is disclosed that contains a water-retentive polymer . . ." (Col. 2, ll. 29–30.)

- "According to one exemplary embodiment, the growing medium comprises a water retentive polymer in combination with bulking material and other components as described below. (Col. 2, ll. 44–47.)

Additionally, the patent explains that the bulking agent makes up 50% to 98% of the "growing medium." (Col. 2, ll. 48–50.) The portion of the specification following the description of the bulking agent then indicates that the "growing medium also includes one or more water retentive polymers." (Col. 3, ll. 35–36.) Then, the specification explains that the "growing medium may also contain various other components." (Col. 4, ll. 32–33.) Scotts argues that this clearly shows that a water retentive-polymer is necessarily included in the term "growing medium."

Rubin argues that Scotts proposed construction imports a limitation from the patent specification into the claims. Rubin asserts that based on the doctrine of claim differentiation the

term "growing medium" cannot include the component of a water-retentive polymer.

"[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. Where there is no meaningful difference between an independent claim and its dependent claim except for the added limitation in the dependent claim the presumption is strong that the independent claim is not restricted by the added limitation in the dependent claim. *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007). Construing the independent claim to share the limitation would render the dependent claim "superfluous." *Anderson Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369–70 (Fed. Cir. 2007).

Claim 3 of the '856 patent adds the limitation of a water retentive polymer to the "growing medium." It states: "The reground growing medium of claim 1, wherein said reground growing medium further comprises a water-retentive polymer." Rubin argues, that based on the doctrine of claim differentiation, claim 3 would be superfluous if the Court were to construe the term "growing medium" to contain a water-retentive polymer.

The Court agrees with Rubin that Scotts' proposed construction would improperly import limitations from the specification into the claim language. "There is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186–87 (Fed. Cir. 1998). The mere fact that a particular embodiment is being taught is generally not sufficient to justify limiting otherwise broad claim scope to the particular embodiment taught. *See, e.g.*, *Agfa Corp. v. Creo Prods., Inc.*, 451 F.3d 1366, 1376–77 (Fed. Cir. 2006) (finding that a claimed "stack" of printing plates was not limited to the particular horizontal stack shown in the specification); *Acumed*, 483 F.3d at 800 (finding that a claimed "transverse" hole in the bone nail was not limited to the particular "perpendicular" orientation shown in the specification).

Therefore, it is important to look at the claim language itself to determine if the limitation

is part of the claim. It is clear, based on the doctrine of claim differentiation, that the term growing medium should not include a water-retentive polymer since the limitation is included in claim 3. *See Phillips*, 415 F.3d at 1315 (presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation is not in the independent claim).

Therefore the Court holds that the term "growing medium" should be construed according to its ordinary meaning.

### 2. Initial Ratio

**Proposed Constructions**

| | |
|---|---|
| **Rubin** | The common meaning of this term should apply. Alternatively, the volume-to-volume ratio at any time prior to compression. |
| **Scotts** | The volume-to-volume ratio at all times prior to the compression of the growing medium to the range of 7:1 to 10:1. If the initial ratio must be less than 3:1, then the volume-to-volume ratio must not be 3:1 or more at any time prior to the final compression to the higher range of 7:1 to 10:1. |

The patent specification has two ratios: the "initial ratio" and the later "ratio ranging from 7:1 to 10:1" ("final ratio"). The transition from the initial ratio to the final ratio occurs as a result of the compression of the growing medium. The parties agree that the term initial ratio is the volume-to-volume ratio before the compression of the growing medium to the final ratio of 7:1 to 10:1. Rubin argues that the term volume-to-volume ratio is less than 3:1 **at any time** prior to the high compression step. Scotts contends that the limitation is met if the ratio is less than 3:1 **at all times** prior to the high compression step.

Scotts explains that the ratio must be less than 3:1 **at all times** based on the following logic:

> Rubin's proposed construction eliminates any meaning of the phrase "initial ratio less than 3:1" and would always be met because of the following syllogism:
> (1) Ratios of 1:1 and 2:1 are less than 3:1 and, by application of simple math, would fall within the scope of the "less than 3:1" claim language; (2) all materials start out in a non-compressed state, and therefore have a volume-to-volume ratio of 1:1; thus (3) all starting materials fall within the scope of the "less than 3:1" ratio limitation.

Scotts further argues that its construction that the initial ratio is less than 3:1 **at all times** is consistent with the patent specification. The specification identifies the importance of not compressing the material at too high a pressure prior to the high compression step. "The bulking agent that is used . . . is also a low-compressed bulking agent being compressed at not more than about 3:1." (Col. 3, ll. 1–3.) "By using a low-compressed bulking agent the speed of rehydration and expansion of the growing medium is increased, and the expanded volume of the growing medium is usually equal to or greater than its volume before it was dehydrated and compressed." (Col. 3, ll. 3–8.)

The Court finds that Scott's proposed construction is too limiting in light of the claims and patent specification. First, it would be nearly impossible to prove or ensure that the volume-to-volume ratio of the growing medium was less than 3:1 **at all times** prior to the high compression step. Next, the limitation that the initial ratio is less than 3:1 is consistent with the patent specification guidance on the important preference of not using material that has been overly compressed but it also explains that the bulking agent should be decompressed if necessary to achieve the ratio of 3:1. (Col. 4, ll. 57–59.) Therefore, the Court will adopt Rubin's proposed construction. "Initial ratio" means the volume-to-volume ratio **at any time** prior to compression.

### 3. Volume-to-Volume Ratio

**Proposed Constructions**

| | |
|---|---|
| **Rubin** | The common meaning of this term should apply. Alternatively, the compressed material expands when exposed to water to a volume 7 or more times its volume before being exposed to water, but no more than about 10 times its volume. The expansion would be determined by adding water to the compressed material, by for example, mixing by hand (such as with a tongue depressor) in a container (allowing drainage at the bottom) the compressed material while adding water, to expand the material. The volume of the expanded material is then compared to the volume of the original compressed material before water is added. |
| **Scotts** | The change in volume per weight of material (volume divided by weight) before compression as compared to the volume per weight of material after compression. The first number in the ratio is the volume per weight of the material prior to the high compression step. The second number in the ratio is the volume per weight after the high compression step. Using a pound of material as an example, a volume- |

> to-volume ratio of 7:1 indicates that the cubic inches per pound (for example) of the pre-compressed material is seven times the cubic inches per pound of the compressed material. Because density is weight divided by volume (pounds per cubic inch, for example), the inverse of volume divided by weight, a 7:1 volume-to-volume ratio means that the density of the post-compression material is seven times the density of the pre-compressed material.

The parties agree that the "ratio" in the phrase "volume-to-volume" is the relationship of the growing medium volume before and after some transformative event. However, the parties disagree on what the event is. Rubin contends that the event is the expansion of the growing material when it is exposed to water and Scotts argues that the event is the compression of the material.

The term volume-to-volume ratio appears in claim 1 and 15. Rubin contends that the subject of these independent claims is an "expanding soil mixture" which is essentially soil that expands after being exposed to water. Therefore, Rubin asserts that the claim volume-to-volume refers to the volume before and after expansion. Rubin's proposed construction is not consistent with where the term "volume-to-volume" appears in claims 1 and 15 or with the patent specification.

As Scotts asserts, where the term appears in claims 1 and 15 reflect that the transformative event is compression. As it appears in claim 1: "wherein said growing medium is **compressed** at a **volume-to-volume ratio** from an initial ratio of less than 3:1 to a ratio ranging from 7:1 to about 10:1." (emphasis added) Similarly, claim 15 states "**compressing** a dehydrated growing medium at a **volume-to-volume ratio** from an initial of less than 3:1 to a ratio ranging from 7:1 to about 10:1." (emphasis added) This clause describes an event where the growing medium is initially compressed less than 3:1 and is then finally compressed to a ratio ranging from 7:1 to about 10:1. Scotts' construction is also consistent with the patent specification. Whenever the patentee discusses the volume-to-volume ratios of "3:1 or less" or "7:1 to about 10:1" the word compressed appears in the sentence but the word expanding or expansion is notably absent. (*See*

col. 1, ll. 40–42; col 1, ll. 44–49; col. 3, ll. 1–3; col 4, ll. 63–63; col. 9, ll. 24–26.)

It is clear from the claim language and the patent specification that the volume-to-volume ratio refers to the volume reduction resulting from compression and not expansion due to hydration. Accordingly, the Court adopts Scotts' proposed construction of the term. "Volume-to-volume ratio" means the change in volume per weight of material (volume divided by weight) before compression as compared to the volume per weight of material after compression. The first number in the ratio is the volume per weight of the material prior to the high compression step. The second number in the ratio is the volume per weight after the high compression step.

### 4. Ratio Ranging from 7:1 to about 10:1

**Proposed Constructions**

| | |
|---|---|
| **Rubin** | The common meaning of this term should apply. Alternatively, the compressed material expands when exposed to water to a volume 7 or more times its volume before being exposed to water, but no more than about 10 times its volume. The expansion would be determined by adding water to the compressed material, by for example, mixing by hand (such as with a tongue depressor) in a container (allowing drainage at the bottom) the compressed material while adding water, to expand the material. The volume of the expanded material is then compared to the volume of the original compressed material before water is added. |
| **Scotts** | The volume per weight of material (volume divided by weight) before compression is seven or more times the volume per weight of material after compression, but no more than about 10 times the volume per weight. |

The term "ratio ranging from 7:1 to about 10:1" appears in claims 1 and 15 following the term "volume-to-volume ratio." The parties agree that how this term is construed is largely dependent how "volume-to-volume ratio" is construed. The Court agrees.

Where this term appears in the claim clearly reflects that the volume of the growing material's volume is reduced between 1/7th and 1/10th its volume before the high compression step. Accordingly, the Court adopts Scotts' proposed construction of the term. "Ratio ranging from 7:1 to about 10:1" means the volume per weight of material (volume divided by weight) before compression is seven or more times the volume per weight of material after compression, but no more than about 10 times the volume per weight.

**5.   Dehydrated Growing Medium**

**Proposed Constructions**

| | |
|---|---|
| **Rubin** | The common meaning of this term should apply. Alternatively, a bulking agent having about 25% or less moisture content. |
| **Scotts** | The growing medium after it has been heated to reduce moisture content to 25% or lower. |

The term "dehydrated growing medium" only appears in method claims 15, 18, 20, 21 and 22. Rubin argues that the plain and ordinary meaning of the term should apply because the term has no special meaning in the art of soil that needs to be laid out for the jury. Alternatively, Rubin asserts that "dehydrated growing medium" means "a bulking agent having about 25% or less moisture content." Rubin's point of view that only the bulking agent is dehydrated is reflected in the patent specification where it provides that the bulking agent is first dehydrated in an air circulating oven to reach a moisture content of about 25%. (Col. 4, ll. 53–55.)

On the other hand, Scotts argues that the dehydrated growing medium must be the entire growing medium and not just the bulking agent based on the tenant of claim construction that two different words for phrases should be given different meanings. *See Innova*, 381 F.3d at 1119 ("While not an absolute rule, all claim terms are presumed to have meaning in a claim.") The Court agrees.

Scotts also asserts that the term "dehydrated growing medium" should be construed as a process step. The term only appears in the method claims of the patent. Turning to the patent specification, Fig. 9 illustrates a "regrinding method." Fig. 9 lists as the first step "dehydrate." However, Fig. 9 is also an example of an exemplary embodiment. Courts should be careful not to read limitations into the claims that appear in preferred embodiments. *Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.") In fact, the language of claim 15 supports the construction that "dehydrated" is not a step. The terms compressing and regrinding appear in claim 15 and refer to actions taken on the growing

medium, i.e. "compressing a dehydrated growing medium" and "regrinding said growing medium." "Dehydrated" as it appears before growing medium is an adjective describing a quality of the growing medium. Therefore, the Court is not persuaded by Scotts' construction that the term "dehydrated growing medium" is a process step.

Moreover, the Court is also not convinced by Scotts' argument that the dehydration must occur through a heating process. Scotts' own argument that the dictionary defines "dehydrate" to means "to remove water" leaves open the possibility that the reduction in moisture can take place by other means without heating.

Even though both parties agree that the term should be construed to have a moisture content of less than 25% the Court does not find that even this limitation should be imported from the patent specification into the claim language. The term "dehydrated growing medium" does not have any special meaning in the context of the '856 patent and accordingly the Court finds that the term needs no further construction. The term "dehydrated growing medium" will be given its plain and ordinary meaning as understood by one of ordinary skill in the art.

### 6. Without Reducing Said Volume-to-volume Ratio
**Proposed Constructions**

| | |
|---|---|
| **Rubin** | The common meaning of this term should apply. Alternatively, the reground material expands at least as much as the compressed (pre-ground) material when exposed to water. In other words, if the compressed (pre-reground) material expands when exposed to water to eight times its volume (according to the protocol incorporated with the definition of "volume-to-volume ratio") the reground material would have to expand when exposed to water to eight times or more its volume before being exposed to water. The testing protocol for the reground is the same as described above for the compressed material in the definition of "volume-to-volume ratio." |
| **Scotts** | The volume per weight of the growing medium does not increase as a result of the regrinding step. In other words, the density of the compressed material cannot decrease as a result of the regrinding step. |

As with the term "ratio ranging from 7:1 to about 10:1", the parties agree that the term "without reducing said volume-to-volume ratio" is largely dependent on how the Court construes

the term volume-to-volume.

The term "without reducing said volume-to-volume ratio" relates to the transformation that occurs during the regrinding step. The volume of the solid wafer before the regrinding step is compared to the volume of the growing medium in particulate form after the regrinding step. Scotts' proposed construction is consistent with the Court's earlier finding that the "volume-to-volume ratio" relates to the transformative step of compression. Accordingly, the Court will adopt Scotts' proposed construction. The term "without reducing said volume-to-volume ratio" means the volume per weight of the growing medium does not increase as a result of the regrinding step.

### 7.   An Expanding Soil

**Proposed Constructions**

| | |
|---|---|
| **Rubin** | The common meaning of this term should apply. Alternatively, soil which expands when exposed to water. |
| **Scotts** | The finished product increases its volume when exposed to water because it absorbs the fluid and retains it under pressure without dissolution. |

Although the parties requested that the Court construe the term "an expanding soil" in conjunction with the other disputed terms, the Court declines to do so at this time. The information provided by the parties was very limited and the parties did not indicate that this term would be crucial to the determination of the issue of infringement with respect to any of the claims. However, if the parties later determine that it has become necessary for the Court to interpret this term, they may request that the Court revisit "an expanding soil."

## CONCLUSION

**IT IS HEREBY ORDERED** that the proposed construction of the twenty-one (21) terms submitted by the parties are construed as contained within this Order and the primary six (6) disputed claim terms in U.S. Patent No. 7,587,856 are construed as follows:

| | |
|---|---|
| **growing medium** | Plain and ordinary meaning. |
| **initial ratio** | The volume-to-volume ratio at any time prior to compression. |

| | |
|---|---|
| **volume-to-volume ratio** | The change in volume per weight of material (volume divided by weight) before compression as compared to the volume per weight of material after compression.  The first number in the ratio is the volume per weight of the material prior to the high compression step.  The second number in the ratio is the volume per weight after the high compression step. |
| **a ratio ranging from 7.1 to about 10.1** | The volume per weight of material (volume divided by weight) before compression is seven or more times the volume per weight of material after compression, but no more than about 10 times the volume per weight. |
| **dehydrated growing medium** | Plain and ordinary meaning. |
| **without reducing said volume-to-volume ratio** | The volume per weight of the growing medium does not increase as a result of the regrinding step. |

DATED this 9th day of December, 2011.

_____
Gloria M. Navarro
United States District Judge